**Colzie D. JAMES, Plaintiff,**

v.

**AMERICAN INTERNATIONAL RECOVERY, INC.,**
**Defendant.**

**No. 1:89–CV–321–RHH.**

United States District Court,
N.D. Georgia,
Atlanta Division.

June 3, 1992.

Steven Keith Leibel, Atlanta, Ga., for plaintiff.

Robert Victor Schnitz, Fisher & Phillips, William Emery Gray, II, Dennis, Corry Porter & Thornton, Atlanta, Ga., P. Kevin Connelly, Connelly Sheehan & Moran, Chicago, Ill., for defendant.

## ORDER

ROBERT H. HALL, District Judge.

This is a civil rights case brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. The case is currently before the court on: (1) Plaintiff's Motion to Set Aside Magistrate's Report and Recommendation [82–2]; (2) Plaintiff's Motion for Leave to Alert Court to Recent Development Concerning the Retroactivity of the Civil Rights Act of 1991 [93–1]; (3) Defendant's Motion to Alert Court to Recent Developments Concerning Non-retroactivity of the Civil Rights Act of 1991 [98–1]; and (4) Plaintiff's Motion to Alter or Amend Judgment and Order filed December 3, 1991 [86–1].

The court: (1) DENIES as moot Plaintiff's Motion to Set Aside Magistrate's Report and Recommendation [82–1]; (2) GRANTS Plaintiff's Motion for Leave to Alert Court to Recent Development Concerning the Retroactivity of the Civil Rights Act of 1991 [93–1]; (3) GRANTS Defendant's Motion to Alert Court to Recent Developments Concerning Non-retroactivity of the Civil Rights Act of 1991 [98–1]; and (4) DENIES Plaintiff's Motion to Alter or Amend Judgment and Order filed December 3, 1991 [86–1].

## BACKGROUND

Plaintiff Colzie D. James was employed by Defendant American International Recovery, Inc. from approximately May, 1984

until her discharge on April 19, 1988. On February 15, 1989, Plaintiff commenced the instant lawsuit, alleging in her Complaint that Defendant discriminated against her on the basis of sex and race by harassing her on the job and ultimately terminating her employment. Specifically, Plaintiff in her Complaint alleged Defendant's discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1981.

Thereafter, this case was referred to a Magistrate Judge sitting as a Special Master pursuant to 42 U.S.C. § 2000e–5(f)(5), Rule 53 of the Federal Rules of Civil Procedure, and Rule 920–2, Internal Operating Procedures of this court. *See Parker v. Dole,* 668 F.Supp. 1563 (N.D.Ga.1987) (Hall, J.) (holding that the referral of discrimination cases to Magistrate Judges is permissible and is in keeping with the purposes of Title VII).

On June 17, 1989, the United States Supreme Court issued its decision in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which decision limited the scope of 42 U.S.C. § 1981. *See* discussion, *infra* p. 1161. Pursuant to *Patterson,* the Magistrate Judge in the instant case dismissed Plaintiff's § 1981 claim. Because the dismissal of Plaintiff's § 1981 claim left Plaintiff with only a Title VII claim, the Magistrate Judge also struck Plaintiff's demand for jury trial. This case was tried before the Magistrate Judge on April 2–4, 1991. On November 1, 1991, the Magistrate Judge issued his Report and Recommendation recommending that Plaintiff's Title VII claim be dismissed as unsupported by the evidence, and that judgment be entered in Defendant's favor on all of Plaintiff's claims.

On November 20, 1991, Plaintiff filed a Motion to Set Aside Magistrate's Report and Recommendation. Plaintiff therein contended that due to the imminent passage of the Civil Rights Act of 1991,[1] the Magistrate Judge's dismissal of Plaintiff's § 1981 claim, as well as his denial of her demand for jury trial of the matter, were in error. Thus, contended Plaintiff, this court should set aside and disregard the Magistrate's Report and Recommendation, reinstate Plaintiff's § 1981 claim, and allow Plaintiff's demand for jury trial of the matter.

On December 3, 1991, after fully reviewing the Magistrate Judge's Report and Recommendation, as well as Plaintiff's Motion to Set Aside, this court adopted the Magistrate Judge's Report and Recommendation, dismissed Plaintiff's Complaint, and entered judgment in Defendant's favor with regard to all of Plaintiff's claims. With regard to Plaintiff's contention that the dismissal of her § 1981 claim and the denial of her demand for jury trial were in error due to the passage of the Civil Rights Act of 1991, this court specifically held: "The Civil Rights Act of 1991 was signed by the President and became effective on November 21, 1991. It does not apply to cases arising before the effective date of the Act." Order dated Dec. 3, 1991.

Presently, Plaintiff has filed, in addition to her Motion to Set Aside Magistrate's Report and Recommendation [82–1], which this court failed specifically to deny, a Motion to Alter or Amend Judgment and Order filed December 3, 1991 [86–1], as well as a Motion for Leave to Alert Court to Recent Development Concerning the Retroactivity of the Civil Rights Act of 1991 [89–1]. In addition, Defendant has filed a Motion for Leave to Alert Court to Recent Developments Concerning Non-retroactivity of the Civil Rights Act of 1991 [98–1]. The court will consider each Motion separately.

## DISCUSSION

I. *Plaintiff's Motion to Set Aside Magistrate's Report and Recommendation*

■ Plaintiff filed this Motion subsequent to the Magistrate Judge's issuance

---

1. Pub.L. No. 102–166, 105 Stat. 1071 (1991) (amending 42 U.S.C. §§ 1981, 1988, and 2000e *et seq.* (1988)). In fact, Plaintiff filed her Motion on November 20, 1991, one day prior to the November 21, 1991 enactment of the Civil Rights Act of 1991. However, this fact alone is of no special significance with regard to the court's instant consideration.

of his Report and Recommendation in the instant case. Although this court indeed considered Plaintiff's Motion prior to the court's issuance of its December 3, 1991 Order adopting the Magistrate's Report and Recommendation, the court in that December 3, 1991 Order did not expressly state that it was denying Plaintiff's Motion to Set Aside. As a result, Plaintiff's Motion apparently was never expressly acted upon by this court, although the practical, and intended, effect of the court's December 3, 1991 Order in fact was to deny Plaintiff's Motion.

Nevertheless, for the sake of clarity, the court hereby expressly states that it DE-NIES as moot Plaintiff's Motion to Set Aside. That Motion, aside from having been rendered moot by this court's December 3, 1991 Order, also advances arguments virtually identical to those presently being reasserted by Plaintiff in her Motion to Alter or Amend this Court's December 3, 1991 Judgment and Order. *See infra,* p. 1160.

## II. *Plaintiff's and Defendant's Motions for Leave to Alert Court to Recent Developments*

In these Motions, both Plaintiff and Defendant request leave to alert this court to recent developments with regard to the currently much debated issue of whether the Civil Rights Act of 1991 is to be applied retroactively so as to allow civil rights plaintiffs with cases currently pending before the court the additional relief provided by the Act. This indeed presents a very difficult question, and one regarding which recent court decisions evidence a marked uncertainty and disagreement. *See* cases cited, *infra* p. 1162 n. 6. Accordingly, this court welcomes the input of the parties as regards recent developments in this area,

the landscape of which literally changes on a daily basis. As a result, the court as an initial matter GRANTS both Plaintiff's and Defendant's Motions to Alert Court to Recent Developments.

## III. *Plaintiff's Motion to Alter or Amend Judgment and Order filed December 3, 1991*

Plaintiff, pursuant to Federal Rule of Civil Procedure 59(e),[2] in this Motion requests that the court alter or amend its Judgment and Order, filed December 3, 1991, in which the court adopted the Magistrate Judge's Report and Recommendation, dismissed Plaintiff's Complaint, and entered judgment in Defendant's favor on all of Plaintiff's claims. In this Motion, Plaintiff in essence reasserts the arguments previously submitted in support of her Motion to Set Aside Magistrate's Report and Recommendation, which has been denied by this court. *See supra,* p. 1160. Specifically, Plaintiff bases her Motion upon her argument that the Civil Rights Act of 1991 should be retroactively applied to her case, so as to allow reinstatement of her previously dismissed § 1981 claim, as well as the allowance of her demand for jury trial of this matter. Thus, Plaintiff requests that this court alter or amend its December 3, 1991 Judgment and Order by rejecting the Magistrate's Report and Recommendation, reinstating Plaintiff's § 1981 claim, and reinstating and granting Plaintiff's demand for jury trial of the instant matter.

In considering Plaintiff's Motion, the central issue before the court is whether certain provisions of the Civil Rights Act of 1991 ("1991 Act"),[3] enacted on November 21, 1991, are to be applied retroactively[4] to cases pending before the court at the time of the statute's enactment.

---

2. Fed.R.Civ.Proc. 59(e) provides that "[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment."

3. Pub.L. No. 102–166, 105 Stat. 1071 (1991) (amending 42 U.S.C. §§ 1981, 1988, and 2000e *et seq.* (1988)).

4. Although the term "retroactive" is sometimes used to refer to the application of new law to a case that has reached a final judgment, this court uses the term to refer to the application of the new law to a case which is pending, having not received a final judgment, at the time of the new law's enactment. Thus, the court expresses no opinion with regard to the application of new laws to final judgments.

## A. The 1991 Civil Rights Act

The 1991 Act states that among its purposes are "[t]o amend the Civil Rights Act of 1964 to strengthen and improve Federal civil rights laws, to provide for damages in cases of intentional employment discrimination, [and] to clarify provisions regarding disparate impact actions...." Pub.L. No. 102–166, 105 Stat. 1071 (1991), "Synopsis." Moreover, § 3 of the Act provides:

SEC. 3. PURPOSES

The purposes of this Act are—

(1) to provide appropriate remedies for intentional discrimination and unlawful harassment in the workplace;

(2) to codify the concepts of "business necessity" and "job related" enunciated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971), and in other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 [109 S.Ct. 2115, 104 L.Ed.2d 733] (1989);

(3) to confirm statutory authority and provide statutory guidelines for the adjudication of disparate impact suits under title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*); and

(4) to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination.

*Id.* at § 3.

Toward these ends, the 1991 Act, among other things, provides more protection to the victims of discrimination by amending the relevant law in reference to damages, jury trials and burdens of proof. Chiefly, the 1991 Act reverses the 1989 Supreme Court holding in *Patterson v. McLean Credit Union*, cited *supra*, in which the Supreme Court substantially restricted the remedies available to a civil rights plaintiff. In *Patterson*, the Court defined 42 U.S.C. § 1981 as prohibiting discrimination only in the *making* of a contract, rather than in any *subsequent conduct* of the parties in the course of the contractual relationship. As a result, the Court held that a plaintiff alleging discrimination in the course of an employment relationship ordinarily could not maintain an action under § 1981. The practical result of the Court's decision in *Patterson* was to severely restrict the causes of action and remedies available to a civil rights plaintiff. Indeed, many civil rights plaintiffs pursuing claims under both Title VII and § 1981 were, following *Patterson,* limited to claims under Title VII.

In response to this situation, Congress drafted § 101(2)(b) of the Act, which provides:

Section 1977 of the Revised Statutes (42 U.S.C.1981) is amended—

.    .    .    .    .

(2) by adding at the end the following new subsections:

.    .    .    .    .

"(b) For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

...."

Also at issue in the instant case is § 102 of the 1991 Act. Section 102(a) and (b) make available to a plaintiff compensatory and punitive damages for intentional violations of Title VII, 42 U.S.C. § 2000e (1988), the Americans with Disabilities Act of 1990, Pub.L. No. 101–336, 104 Stat. 327, 42 U.S.C. § 12101 et seq. (1990), and § 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 (1988). The Act does, however, place a cap on punitive damages recoverable by the plaintiff, based upon the number of employees employed by the defendant. *See* 1991 Act, § 102(b)(3). Subsequent to *Patterson* and prior to enactment of the 1991 Act, a plaintiff proceeding under one of these statutes was entitled to recover only equitable remedies in the form of back pay and injunctive relief. Section 102(c) of the 1991 Act provides that a plaintiff seeking compensatory and punitive damages

under subsections (a) and (b) enjoys a right to a jury trial if so demanded.[5]

Plaintiff in the instant case contends that §§ 101(2)(b) and 102 of the Act should be retroactively applied to her case, resulting in this court's reconsideration of its December 3, 1991 Judgment and Order, the setting aside of the Magistrate's Report and Recommendation, the reinstatement of Plaintiff's § 1981 claim, and the allowance of a jury trial of the instant matter. In so arguing, Plaintiff places squarely before this court the much debated issue of whether those sections of the 1991 Act should be retroactively applied so as to allow Plaintiff's requested relief.

As numerous courts have recognized, this is an issue riddled with conflict, not only within this district and circuit, but extending as far as the Supreme Court of the United States. The various courts recently faced with this question have come down on all conceivable sides of the issue, with the result that judicial opinions generated at all levels rely upon conflicting precedent to reach equally conflicting results,[6] some courts acknowledging the obvious conflict and confusion, others sweeping it away under one logical guise or another as inapplicable to the specific case at hand.

This court sets forth in this opinion to address the conflict directly. As an initial matter, the court apologizes for the length and rather involved nature of the following analysis. However, this is an issue which

---

**5.** Section 102 of the 1991 Act provides in pertinent part:

(a) Right of Recovery—
(1) Civil rights. In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5) against a respondent who engaged in unlawful intentional discrimination ... prohibited under section 703, 704, or 717 of the Act (42 U.S.C. 2000e–2 or 2000e–3), and provided that the complaining party cannot recover under section 1977 of the revised Statutes (42 U.S.C.1981), the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

. . . . .

(b) Compensatory and Punitive Damages—
(1) Determination of punitive damages. A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

. . . . .

(c) Jury Trial. If a complaining party seeks compensatory or punitive damages under this section—
(1) any party may demand a trial by jury....

**6.** For example, compare Bailey v. Am. Int'l Adjustment Co., Civ.Action No. 1:91–cv–1524–RLV (N.D.Ga. April 20, 1992) (Vining, J.) (1991 Act given retroactive application); Glanton v. Henkel Chem. Corp., Civ.Action No. 4:91–cv–119–HLM (N.D.Ga. April 2, 1992) (Murphy, J.) (same); Gilbert v. Milliken & Co., 794 F.Supp.

376 (N.D.Ga.1992) (Tidwell, J.) (same); Curtis v. Metro Ambulance Serv., Inc., Civ.Action No. 1:89–CV–1867–JOF (N.D.Ga. March 25, 1992) (Forrester, J.) (same); Leatherwood v. Eastman Kodak Co., Civ.Action No. 1:89–cv–264–HTW (N.D.Ga. March 23, 1992) (Ward, J.) (same); Jones v. Dekalb County, Civ.Action No. 1:90–cv–2262–HTW (N.D.Ga. March 19, 1992) (Ward, J.) (same); Carmichael v. Fowler, Civ.Action No. 1:88–cv–969–HTW, 1992 WL 120353 (N.D.Ga. March 11, 1992) (Ward, J.) (same); Long v. Carr, 784 F.Supp. 887 (N.D.Ga.1992) (Freeman, J.) (same); Stender v. Lucky Stores, Inc., 780 F.Supp. 1302, 57 Fair Empl.Prac.Cas. (BNA) 1445, 57 Empl.Prac.Dec. (CCH) P41,234 (N.D.Cal.1992) (Patel, J.) (same); King v. Shelby Medical Center, 779 F.Supp. 157, 58 Fair Empl. Prac.Cas. (BNA) 435 (N.D.Ala.1991) (Acker, J.) (same); Mojica v. Gannett Co., 779 F.Supp. 94, 99, 57 Fair Empl.Prac.Cas. (BNA) 537, 58 Empl. Prac.Dec. (CCH) P41,266 (N.D.Ill.1991) (Hart, J.) (same) with Huey v. Sullivan, 971 F.2d 1362 (8th Cir.1992); Mozee v. Am. Commercial Marine Serv. Co., 963 F.2d 929 (7th Cir.1992) (retroactive application of 1991 Act not allowed); Fray v. Omaha World Herald Co., 960 F.2d 1370 (8th Cir.1992) (same); Vogel v. City of Cincinnati, 959 F.2d 594, 58 Fair Empl.Prac.Cas. (BNA) 402 (6th Cir.1992) (same); Washington v. Int'l Business Machines Corp., Civ.Action No. 1:91–CV–1258–ODE (N.D.Ga. March 9, 1992) (Strother, M.J.) (same); Ihedioha v. Emro Marketing Co., Civ.Action No. 1:91–CV–2873–ODE, 1992 WL 176985, 1992 U.S.Dist. LEXIS 5217, 58 Fair Empl.Prac.Cas. (BNA) 106 (N.D.Ga. Jan. 29, 1992) (Chancey, M.J.) (same); James v. Am. Int'l Recovery, Inc., Civ.Action No. 1:89–CV–321–RHH, 1991 WL 281734, 1991 U.S.Dist. LEXIS 18408 (N.D.Ga. Dec. 3, 1991) (Hall, J.) (same); Van Meter v. Barr, 778 F.Supp. 83 (D.D.C.1991) (Gesell, J.) (same); Hansel v. Pub. Serv. Co. of Colo., 778 F.Supp. 1126, 57 Fair Empl.Prac.Cas. (BNA) 858 (D.Colo.1991) (Babcock, J.) (same).

is not only riddled with conflict, but also of great importance, to both the judiciary and legislative branches of our government. It therefore is this court's opinion that it is not only desirable, but also necessary, for the courts to proceed as expeditiously as possible toward an eventual resolution of this issue of basic statutory construction, which indeed cuts to the very heart of the legislative-judicial relationship.

### B. Judicial Conflict Regarding Retroactivity

The course of development and general nature of the precedential conflict at issue in this lawsuit is by now well known to all who have been faced with the question currently before this court. The court therefore will struggle for brevity in outlining those underlying considerations. First, it is well established that in determining whether a statute will be applied retroactively or prospectively only, the first duty of the court is to look to the language of the statute itself. *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 180, 100 S.Ct. 2601, 2605, 65 L.Ed.2d 696 (1980). "Absent a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

Where the language of the statute is unclear, the court must examine the statute's legislative history. The Supreme Court has clearly stated that "where the congressional intent is clear, it governs." *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 837, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990).

Where both the statute's language and its legislative history are unclear with regard to retroactivity, the Supreme Court has fashioned certain well defined presumptions to determine the applicability of new laws to pending cases. Unfortunately, the Supreme Court in so doing has developed two distinct and conflicting lines of cases which weigh upon this court's decision. One line of cases is represented by the Supreme Court's decision in *Bradley v.*

*Richmond School Bd.*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), and the other by the Court's decision in *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).

In *Bradley*, the Supreme Court was called upon to determine the propriety of retroactively applying a newly enacted civil rights attorney's fees statute to a pending school desegregation case. Specifically, the Court was faced with the determination of whether § 718 of Title VII of the Emergency School Aid Act, 20 U.S.C. § 1617 (Education Amendments of 1972), which authorized an award of attorney's fees to a prevailing plaintiff where no such authorization had existed previously, could be retroactively applied to a rather protracted case which had been in the courts for some thirteen years, and the appeal of which was pending at the time of § 718's enactment. Relying primarily upon the Court's earlier decisions in *Thorpe v. Housing Auth. of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) and *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), the Court in *Bradley* concluded that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U.S. at 711, 94 S.Ct. at 2016.

According to the Court in *Bradley*, the determination of whether "manifest injustice" would result from the retroactive application of the provision in question depends upon the court's analysis of the following three factors: "(1) the nature and identity of the parties, (2) the nature of their rights, and (3) the nature of the impact of the change in law upon those rights." *Id.* at 717, 94 S.Ct. at 2019.

In *Bowen*, the Supreme Court was called upon to determine the propriety of retroactive application of certain newly adopted Department of Health and Human Services ("DHHS") regulations to a pending case. Such retroactive application, if permitted, would have necessitated the return to the government of reimbursement payments given to health care providers pursuant to

the Medicare Act, 42 U.S.C. § 1395x(v)(1)(A). Rather than following *Bradley,* the Court in *Bowen* looked to another line of its earlier decisions, including *Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964), *Claridge Apartments Co. v. Comm'r,* 323 U.S. 141, 164, 65 S.Ct. 172, 174, 89 L.Ed. 139 (1944), *Miller v. United States,* 294 U.S. 435, 439, 55 S.Ct. 440, 441, 79 L.Ed. 977 (1935), and *United States v. Magnolia Petroleum Co.,* 276 U.S. 160, 162–163, 48 S.Ct. 236, 237, 72 L.Ed. 509 (1928). After examining that line of precedent, the Court in *Bowen* concluded, "Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." 488 U.S. at 208, 109 S.Ct. at 471. Accordingly, the Court in *Bowen* concluded that retroactive application of the DHHS regulations in that case was impermissible.

Under both *Bradley* and *Bowen,* where the language of the statute is clear, that statutory mandate is to be followed. Likewise, where the legislative history evidences a clear legislative intent with regard to retroactivity, that legislative intent is to be honored. Where both the statutory language and the legislative history are unclear, under *Bowen,* the presumption is against retroactive application. In contrast, under *Bradley,* the presumption is in favor of retroactive application, the only exception being if retroactive application of the statute would be manifestly unjust. Clearly, therefore, in cases where the statute itself does not address retroactivity, and the legislative history is unclear, *Bradley* and *Bowen* oftentimes mandate opposite results, the only exception being cases falling within *Bradley*'s "manifest injustice" exception.

In *Kaiser Aluminum and Chemical Corp. v. Bonjorno,* cited *supra,* the Supreme Court acknowledged the "apparent tension" between these two lines of precedent but refused to reconcile the conflict. 494 U.S. at 837, 110 S.Ct. at 1576. The problem is well stated in a concurrence by Justice Scalia in which he states:

I regret that the court has chosen not to respond to the conflict between two relatively recent cases saying that unless there is specific indication to the contrary a new statute should be applied retroactively absent "manifest injustice" ..., and the many cases, old and new which have said that unless there is specific indication to the contrary the new statute should be applied only prospectively. In the rules of construction that they announce, if not in the results they produce, these two lines of cases are not merely, as the [majority of the] Court confesses, in "apparent tension," they are in irreconcilable contradiction, and have spawned Courts of Appeals opinions to match.

*Id.*

Unfortunately, and in accordance with Justice Scalia's remarks in *Bonjorno,* the conflict in the Supreme Court is reflected in decisions of the Eleventh Circuit Court of Appeals, the pronouncements of which necessarily determine the course of decision to be taken by this court. That is, the Eleventh Circuit has followed both lines of Supreme Court precedent on this issue while at the same time acknowledging the resulting confusion. *See United States v. Peppertree Apartments,* 942 F.2d 1555, 1561 n. 3 (11th Cir.1991), *petition for cert. granted and judgment vacated sub nom. Bailes v. United States,* —— U.S. ——, 112 S.Ct. 1755, 118 L.Ed.2d 419 (1992); *Wright v. Director, Fed. Emergency Mgt. Agency,* 913 F.2d 1566, 1573 (11th Cir.1990). In *Wright,* the Court stated:

[T]he principle affirmed in *Bradley* has generated some confusion in the federal courts, since it appears to conflict with the ... long-standing rule of statutory construction, restated in *Bowen,* that favors the prospective application of statutes and regulations.

913 F.2d at 1573.

First, in *Wright,* the Eleventh Circuit considered the propriety of retroactive application of a newly promulgated regulation of the Federal Emergency Management Agency. After acknowledging and

fully discussing both the *Bowen* and *Bradley* presumptions, the Court in *Wright* stated:

> [W]e agree with the Supreme Court's pronouncement that statutes (and regulations) "are not to be given retroactive effect or construed to change the status of claims fixed in accordance with earlier provisions unless the legislative purpose so to do plainly appears."

*Id.* at 1574 (quoting *Magnolia*, cited *supra*, 276 U.S. at 162–63, 48 S.Ct. at 237). Thus, the Court in *Wright* adopted the *Bowen* approach, and as a result found retroactive application to be impermissible in that case.

Inexplicably, the Eleventh Circuit the very next year, in deciding *Peppertree*, unequivocally held that pursuant to *Bradley*, " 'a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.' " 942 F.2d at 1560–61 (quoting *Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016). Although recognizing in a footnote the potential conflict with both *Bowen* at the Supreme Court level and *Wright* within the circuit, the Court stated in the same footnote, "This circuit has relied upon the *Bradley* analysis to determine the retroactive application of statutory changes." *Id.* at 1561 n. 3 (citing *Fed'l Deposit Ins. Corp. v. 232, Inc.*, 920 F.2d 815, 818 n. 4 (11th Cir.1991)). Thus, concluded the Court in *Peppertree*, "unless otherwise directed by the United States Supreme Court or the Eleventh Circuit en banc, we are bound by precedent to apply the *Bradley* analysis." *Id.* (citing *United States v. Thomas*, 916 F.2d 647, 652 n. 6 (11th Cir.1990)).

In *Peppertree*, the government alleged that the defendants had disbursed funds received from the Department of Housing and Urban Development ("HUD") in violation of a regulatory agreement between the parties. Specifically at issue in *Peppertree* was the retroactive application of a damages statute enacted subsequent to the de-

fendants' alleged violation of the regulatory agreement, so as to allow the government to recover double damages in that case.[7] After determining that that case did not fall within the *Bradley* analysis' "manifest injustice" exception, the Court found retroactive application of the damages statute in question to be appropriate.

The *Peppertree* decision was also based upon the Court's recognition that "[s]tatutory changes that are remedial in nature apply retroactively." *Id.* at 1560 (citing *Lussier v. Dugger*, 904 F.2d 661, 665 (11th Cir.1990) ("Statutory changes that are procedural or remedial in nature apply retroactively.") (quoting *United States v. Vanella*, 619 F.2d 384, 386 (5th Cir.1980)) (also citing *United States v. Fernandez–Toledo* 749 F.2d 703, 705 (11th Cir.1985) ("[C]ases in this circuit have held that new statutes that affect antecedent rights will not apply retroactively while those that affect only procedure or remedy will apply retroactively.")). The Court in *Peppertree* concluded that since the statute in question affected only remedy, it was to apply retroactively.

Thus, the Eleventh Circuit, through *Wright* and *Peppertree*, has in effect chosen as the law to be applied in this circuit two directly conflicting lines of precedent handed down by the Supreme Court. As an initial matter, it is well established that one circuit panel may not overrule the decision of a prior circuit panel. *See United States v. Hamblin*, 911 F.2d 551, 554 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2241, 114 L.Ed.2d 482 (1991) (three-judge circuit panel is bound by circuit precedent even if such precedent has not been followed or cited with approval since its publication); *United States v. Machado*, 804 F.2d 1537, 1543 (11th Cir.1986) ("Only a decision by this court sitting en banc or by the United States Supreme Court can overrule a prior panel decision."); *Robinson v. Tanner*, 798 F.2d 1378, 1383 (11th Cir. 1986), *cert. denied*, 481 U.S. 1039, 107 S.Ct. 1979, 95 L.Ed.2d 819 (1987) ("[O]ne panel of this court may not overrule the decision of

---

7. 12 U.S.C. § 1715z–4a(c) allows the Attorney General of the United States, in any case alleging the unauthorized use of multifamily housing

project assets in which the United States prevails, to recover double damages plus costs. *See Peppertree*, 942 F.2d at 1560 and n. 1.

a prior panel.") (citing *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) ("The old Fifth [Circuit] followed the absolute rule that a prior decision of the circuit (panel or en banc) could not be overruled by a panel but only by the court sitting en banc. The Eleventh Circuit decides in this case that it chooses, and will follow, this rule.")); *Druid Hills Civic Ass'n v. Fed. Highway Admin.,* 772 F.2d 700, 716 n. 18 (11th Cir.1985), *cert. denied,* 488 U.S. 819, 109 S.Ct. 60, 102 L.Ed.2d 38 (1988) ("[O]nly this court sitting en banc or the United States Supreme Court can overrule precedent binding on this court.") (citing *Julius v. Johnson,* 755 F.2d 1403, 1404 (11th Cir.1985) (per curiam)). Rather, where two circuit court decisions contain conflicting rules of law, this court is bound by both circuit decisions. *Ga. Ass'n of Retarded Citizens v. McDaniel,* 855 F.2d 794, 797 (11th Cir.1988).

■ Nevertheless, decisions issued by the circuit court sometimes conflict, thus requiring lower courts such as this one to decide which precedent to follow. The rule within the Eleventh Circuit is that in the event there is an intra-circuit conflict on a given issue, the district court is required to follow Supreme Court authority "or the weight of authority within the circuit." *United States v. Hobson,* 672 F.2d 825, 827 (11th Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). *See also, McDaniel,* 855 F.2d at 797; *Dorse v. Armstrong World Indus.,* 798 F.2d 1372, 1376 (11th Cir.1986); *Gresham Park Community Org. v. Howell,* 652 F.2d 1227, 1235 (5th Cir.1981). When there is no clear weight of authority within the circuit, the court must "resort to common sense and reason" in deciding which rule to follow. *Hobson,* 672 F.2d at 827. *See also, McDaniel,* 855 F.2d at 797; *Dorse,* 798 F.2d at 1376.

Thus, courts such as this one currently find themselves in a very confusing situation, and one which offers virtually no hope, at least in the near future, of the arrival of either any clear rules of statuto-

ry construction or any real consistency in outcome. The Supreme Court has issued two lines of precedent which seemingly are in direct conflict, at least in a substantial number of cases. As a result, the Eleventh Circuit likewise has issued two lines of precedent to which this court is bound.[8] Finally, the Eleventh Circuit has mandated that, in determining which precedent to follow, lower courts faced with this situation should apply "common sense and reason" in determining which is the better precedent. This court respectfully submits that it wonders whether, viewed together, these tests enumerated by the Supreme Court and the Eleventh Circuit, if submitted to the scrutiny generally applied to statutes, would be deemed void for vagueness. That is, these tests, viewed together, seem to this court to offer no clear precedent for the instant disposition whatsoever.

### C. Analysis of the Instant Situation

#### 1. Statutory Language of the 1991 Act

As stated before, any process of statutory construction necessarily begins with the language of the statute itself. With regard to the 1991 Act, the text of the Act does not address whether it is to be applied retroactively or prospectively only. Section 402(a) provides simply that, "[e]xcept as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment." Nevertheless, the mere fact that the Act is to become effective "upon enactment" says nothing about whether, following such enactment, the Act's provisions are to be applied to conduct occurring, and cases commenced, prior to that enactment, or only to conduct occurring and cases commenced subsequent to enactment.

In the instant case, Defendant argues that the express language of § 402(a) itself indicates that the statute is not to be applied retroactively. Defendant cites the Court's recent decision in *Holman v. Macy's South,* No. 1:91–CV–2324–JTC, 57 Fair Empl.Prac.Cas. (BNA) 1405, 1992 WL

---

**8.** For a discussion of the precedential viability of the *Peppertree* line of cases, however, *see* *infra,* pp. 1175–77.

117107 (N.D.Ga. Jan. 8, 1992) (Harper, M.J.). In *Holman,* the Court relied upon the Eleventh Circuit decision in *Wilson v. Gen. Motors Corp.,* 888 F.2d 779 (11th Cir.1989), in holding that the language, "effective upon the date of enactment", employed in § 402(a) should be interpreted as indicating that the Act is to be applied only to conduct occurring after that date. *Holman,* 57 Fair Empl.Prac.Cas. (BNA) at 1405 (citing *Wilson,* 888 F.2d at 781). Nevertheless, the court finds this argument unpersuasive. Rather, this court finds that the phrase "effective upon the date of enactment" says nothing about whether the Act is to be applied retroactively to cases pending at the time of its enactment.

As a second grounds for arguing that the language of the Act itself indicates that it is to be applied prospectively only, Defendant contends that the Act's own definition of the term "complaining party", which is found in § 104(*l*) of the Act, indicates that the Act is to be applied prospectively only. Section 104(*l*) provides that "[t]he term 'complaining party' means the Commission, the Attorney General, or a person who may bring an action or proceeding under this title." Here, Defendant argues that the phrase "a person who *may bring* an action" indicates that plaintiffs who have *already brought* actions are to be excluded from the Act's coverage. Defendant quotes *Van Meter v. Barr,* 778 F.Supp. 83, 85 (D.D.C.1991) (Gesell, J.), for the proposition that "[b]y its terms, the statute seems to contemplate that only plaintiffs who have not yet brought their actions are entitled to invoke the new Act." The court realizes that the Court in *Van Meter* found Defendant's present argument persuasive, and refused to allow retroactive application of the Act, seemingly on that basis alone. Nevertheless, this court is unpersuaded. Given the many ambiguities in both the statutory language and the legislative history in the instant case, *see infra,* the court finds that basing its present decision on the mere use of the phrase "may bring" in a single definition in the Act not only would

ignore the reality of this very confused situation, but also would require that the court hang its hat on mere technicalities of construction. This the court refuses to do.

The only two additional sections even addressing the retroactivity issue are §§ 109 and 402(b) of the Act. First, § 109 specifically overrules *Equal Employment Opportunity Comm'n v. Arabian Am. Oil Co.,* 499 U.S. ——, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991),[9] by providing that Title VII applies to United States citizens employed in foreign countries. Subsection (c) of § 109 provides that "[t]he amendments made by [§ 109] shall not apply with respect to conduct occurring before the date of the enactment of this act." 1991 Act, § 109(c).

Second, § 103 of the Act specifically overrules *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). Due to the fact that *Wards Cove* had been vigorously litigated before the courts for some 24 years, interested parties sought to obtain extra protection from the retroactive application of § 103 to disturb and hinder the progress of that lengthy litigation. In response, § 402(b) of the Act was drafted, its sole purpose being to provide to the Wards Cove Packing Company additional protection from any retroactive application of § 103 of the Act to that ongoing litigation. *See* 137 Cong.Rec. S15963 (daily ed. Nov. 5, 1991) (statement of Sen. Kennedy) ("[Section 402(b)] only keeps the bill from applying to the parties in the *Wards Cove* case itself...."); 137 Cong.Rec. S15478 (daily ed. Oct. 30, 1991) (interpretive memorandum submitted by Sen. Dole) ("At the request of the Senators from Alaska, section [402(b)] specifically points out that nothing in the Act will apply retroactively to the Wards Cove Packing Company, an Alaska company that spent 24 years defending against a disparate impact challenge."). Specifically, § 402(b) provides:

Notwithstanding any other provision of this Act, nothing in this Act shall apply

---

**9.** —— U.S. ——, 111 S.Ct. 1227, 113 L.Ed.2d 274, 55 Fair Empl.Prac.Cas. (BNA) 449, 55 Empl.

Prac.Dec. (CCH) P40,607.

to any disparate impact case for which a complaint was filed before March 1, 1975 and for which an initial decision was rendered after October 30, 1983.

1991 Act, § 402(b). Section 402(b) was added to the third version of the Senate bill that eventually became the 1991 Act, S. 1745.[10]

This court recognizes the potential for arguing, as Plaintiff does here, that since §§ 109(c) and 402(b) of the Act specifically except a special category of cases from retroactive application, the remaining portions of the Act must by implication apply retroactively. Nevertheless, the court rejects that argument. Both § 109(c) and § 402(b) by their express language provide for very limited application, § 109(c) applying strictly to claims asserted under § 109 of the Act, and § 402(b) applying strictly to the *Wards Cove* litigation.

With regard to § 402(b) specifically, the statements made by various Senators as well as Representatives clearly indicate that both sides of Congress intended for that section to apply to the *Wards Cove* litigation alone, and furthermore for § 402(b) not to be construed to speak to the intended application of the Act as a whole. In the Senate, Senator Danforth expressed his view that § 402(b)

> is intended only to provide additional assurance that the provisions of the bill will not be applied to certain cases that fit the provisions of that subsection. It should not be read in derogation of the sponsors' intention not to provide for retroactive effect or application as expressed in subsection [402(a)] of the bill.

137 Cong.Rec. S15483 (daily ed. Oct. 30, 1991). Likewise, Senator Murkowski, who introduced § 402(b), stated:

> The inclusion of language regarding this case [*Wards Cove*] should not be interpreted as a precedent for any other case. Nor should it be viewed as creating an implication regarding whether or not this legislation applies retroactively generally. It is to be interpreted as a congres-

sional determination that regardless of how the general retroactivity issue is resolved, the *Wards Cove* case is one in which it is clear that this legislation should not apply retroactively.

*Id.* at S15493 (daily ed. Oct. 30, 1991). In addition, Senator Dole introduced into the Congressional Record an interpretive memorandum explaining that it was not Congress' intent that § 402(b) be interpreted to indicate that the rest of the Act should apply retroactively. That memorandum states:

> Absolutely no inference is intended or should be drawn from the language of this amendment to section 402 that the provisions of the Act or the amendments it makes may otherwise apply retroactively to conduct occurring before the date of enactment of this Act. Such retroactive application of the Act and its amendments is not intended; on the contrary, the intention of this amendment to section 402 is simply to honor a commitment to eliminate every shadow of a doubt as to any possibility of retroactive application to the case involving the Wards Cove Company.

*Id.* at S15953 (daily ed. Nov. 5, 1991).

On the House side, Representative Hyde stated:

> [*Wards Cove*] has been in the court for 24 years and someday it ought to be closed, but this bill is prospective and therefore *Wards Cove* is not affected by it.... Now, the offending amendment that was put in by the Senate is unnecessary. It is surplusage. It does not accomplish or achieve a thing and it really should not be the subject of so much excitation.

137 Cong.Rec. H9512 (daily ed. Nov. 7, 1991). Thus, in light of the numerous statements by various Senators and Representatives alike, to the effect that § 402(b) does not speak to the retroactivity of the Act as a whole, the court declines to adopt Plaintiff's position to the contrary.

**10.** *Compare* 1991 S.1745, Nov. 1, 1991, Version 2, § 402, *with* 1991 S.1745, Nov. 8, 1991, Version 3, § 402.

On the other hand, the court is also aware of the potential for arguing, as Defendant does here, that since Congress failed to include a provision expressly authorizing retroactive application, they necessarily must have intended for the Act to have prospective effect only. Nevertheless, the court is equally unpersuaded by Defendant's proposed stance. As the Seventh Circuit Court of Appeals has recognized, Defendant's argument is negated by the fact that although the Bush Administration submitted a proposed bill which contained explicitly prospective language, Congress expressly declined to adopt that proposal.[11] *Mozee v. Am. Commercial Marine Serv. Co.*, 963 F.2d 929 (7th Cir.1992).

In addition, Plaintiff apparently argues that since Congress in enacting the 1991 Act expressly overruled the Supreme Court decision in *Patterson*, this court is precluded from finding that the Act applies prospectively only, but rather is *required* to apply the Act retroactively. Here Plaintiff argues:

> In passing the 1991 Act Congress was correcting and clarifying what the scope of Section 1981 contained.... Therefore, there is no need to determine if the provisions of the 1991 Act should be applied retroactively, as Congress has stated, in effect, that the *Patterson* decision was erroneous, and that Section 1981 applies, and was intended to apply to terminations at all times previous to *Patterson*, and afterwards. Clearly, the separation of powers doctrine is the governing principle in rendering a decision with regard to the scope of Congressional intent.

Plaintiff's Reply to Defendant's Supplemental Brief in Opposition to Plaintiff's Motion to Alter or Amend Judgment or Order entered December 3, 1991, filed April 2, 1992 [96–1], pp. 9–10. The court finds Plaintiff's argument to be totally without merit. The mere fact that Congress enacts legislation overruling a line of Supreme Court decisions says nothing about whether that new legislation is to be applied retroactively or prospectively only. Plaintiff's concern with the separation of powers doctrine is here misplaced. Indeed, Plaintiff's proposed interpretation would itself turn the separation of powers doctrine on its head, by in effect vesting Congress with the power to formulate legal precedent binding upon the courts. This is clearly prohibited by the separation of powers doctrine.

Having carefully examined the above provisions of the 1991 Act, this court agrees with the numerous courts previously conducting the same analysis which have found that the statutory language of the Act is unclear with regard to the retroactivity issue. *See, e.g., Mozee v. Am. Commercial Marine Serv. Co.*, cited *supra*, 963 F.2d at 933 ("[W]e cannot divine from the Act's language whether Congress intended the Act to apply retroactively to pending cases."); *Fray v. Omaha World Herald Co.*, 960 F.2d 1370 (8th Cir.1992) (at most, § 402(a) "creates (or preserves) an ambiguity as to whether Congress intended the Act to be generally retroactive."); *Vogel v. City of Cincinnati*, 959 F.2d 594, 58 Fair Empl.Prac.Cas. (BNA) 402 (6th Cir.1992) ("The 1991 [A]ct, on its face, does not make clear whether it should [be] applied retroactively or prospectively."); *Bailey v. Am. Int'l Adjustment Co., Inc.*, Civ.Action No. 1:91–cv–1524–RLV (N.D.Ga. April 20, 1992 (Vining, J.), Order at 2 (the language of the Act is not clear with regard to retroactivity); *Glanton v. Henkel Chem. Corp.*, Civ.Action No. 4:91–cv–119–HLM (N.D.Ga. April 2, 1992) (Murphy, J.), Order at 3 (same); *Curtis v. Metro Ambulance Serv., Inc.*, Civ.Action No. 1:89–CV–1867–JOF (N.D.Ga. March 25, 1992) (Forrester, J.), Order at 4 (same); *Long v. Carr*, 784 F.Supp. 887, 889 (N.D.Ga.1992) (Freeman, J.), (same).

### 2. Legislative History of the 1991 Act

In light of the ambiguous language of the 1991 Act, the court must next examine

---

**11.** Section 14 of the Bush proposal provided:
    SEC. 14. EFFECTIVE DATE
    This Act and the amendments made by this Act shall take effect upon enactment. The amendments made by this Act shall not apply to any claim arising before the effective date of this Act.
H.R. 1375, 102d Cong., 1st Sess. (1991).

its legislative history in an attempt to identify "clear legislative intent" regarding the retroactivity issue. With regard to whether the 1991 Act's legislative history evidences a clear legislative intent regarding retroactivity, the courts, once again, come down on both sides of the issue. *For example, compare Stevens v. Mann,* No. H–90–2175, 57 Fair Empl.Prac.Cas. (BNA) 1290, 1292, 1992 WL 101764 (S.D.Tex.1992) (Harmon, J.) (1991 Act's language and legislative history indicate a congressional intent not to retroactively apply its provisions) *with Mozee,* 963 F.2d at 934 ("A clear indication of congressional intent cannot be deciphered from the legislative history or the 1991 Act's language."); *Fray,* 960 F.2d at 1376 (legislative history indicates no clear congressional intent regarding retroactivity); *Vogel,* 959 F.2d at 598 ("The legislative history provides no guidance on [the] question [of retroactivity]."). Courts in this district have consistently found the Act's legislative history to be unclear with regard to the issue of retroactivity. *See, e.g., Glanton,* Order at 4 ("[C]ongressional intent concerning the retroactivity of this new law is anything but clear."); *Curtis,* Order at 6 ("[T]he legislative history of the Act concerning retroactivity is inconclusive."); *Long,* 784 F.Supp. at 889 ("[N]either the language of the Act, nor the legislative history explicitly indicates whether the Act should apply retroactively."). Nevertheless, in light of the divergent findings of the various courts on this issue, this court feels compelled to conduct its own independent analysis of the legislative history in question.

In 1990, Congress passed an initial civil rights bill [12] overruling *Patterson* and certain Supreme Court Title VII decisions. This bill specifically provided for retroactive application to conduct occurring prior to its enactment. The President vetoed the 1990 bill, citing, *inter alia,* the bill's "unfair retroactivity rules." *President's Message to the Senate Returning Without Approval the Civil Rights Act of 1990,* 26 Weekly Comp.Pres.Doc. 1632, 1634 (Oct. 22, 1990). Congress' attempted override failed.

The following year, Congress again took up this subject, and the House again passed a bill overruling *Patterson.*[13] This second bill likewise expressly provided for retroactive application.[14] In the Senate, bipartisan sponsors drafted a compromise bill, S.1745, during the summer of 1991. In drafting this compromise bill, the sponsors, realizing that the President would not sign a bill expressly providing for retroactive application, deleted the retroactivity provisions. *See* 137 Cong.Rec. S15503–12 (daily ed. Oct. 30, 1991), S.1745, § 402.[15] Subsequently, S.1745 passed both the Senate and House, and became law when the President signed it two weeks later, on November 21, 1991. *See President's Signing Statement,* 1991 U.S.C.C.A.N., Vol. 11, p. 768, 27 Weekly Comp.Pres.Doc. 1701 (Nov. 25, 1991).

Although there were no legislative committee reports explaining S.1745, the congressional floor debates were extensive and involved vigorous participation by both proponents and opponents of retroactivity. Apparently, the only thing these two congressional factions *did* agree upon with regard to retroactivity was that Congress was leaving it "to the courts to determine the extent to which the bill will apply to cases and claims that are pending on the date of enactment." 137 Cong.Rec. S15485 (daily ed. Oct. 30, 1991) (statement of Sen.

---

**12.** H.R. 4000; S.2104 (101st Cong., 2d Sess., 1990). *See also,* H.Rpt. 101–644, Parts 1 and 2 (101st Cong., 2d Sess., 1990); H.Rpt. 101–755; S.Rpt. 101–315 (101st Cong., 2d Sess., 1990).

**13.** H.R. 1 (1991) (102d Cong., 1st Sess.1991). *See also,* H.Rpt. 102–40, Parts 1 and 2 (102d Cong., 1st Sess.1991).

**14.** For the different versions of H.R. 1, *see* 1991 H.R. 1 Jan. 6, 1991 (Version 1), § 15; 1991 H.R. 1 March 11, 1991 (Version 2), § 15; 1991 H.R. 1 May 18, 1991 (Version 3), § 15; 1991 H.R. 1 June 7, 1991 (Version 4), § 113; 1991 H.R. 1 June 12, 1991 (Version 5), § 113; 1991 H.R. 1 July 9, 1991 (Version 6), § 113.

**15.** For the different versions of S.1745, *see* 1991 S.1745, Sept. 26, 1991 (Version 1), § 22; 1991 S.1745, Nov. 1, 1991 (Version 2), § 402; 1991 S.1745, Nov. 8, 1991 (Version 3), § 402; 1991 S.1745, Nov. 13, 1991 (Version 4), § 402; 1991 S.1745, Dec. 10, 1991 (Version 5), § 402.

Kennedy); 137 Cong.Rec. S15963 (daily ed. Nov. 5, 1991) (statement of Sen. Kennedy). Although they agreed on the *fact* that they were leaving this decision to the courts, congressional proponents and opponents of retroactivity, not surprisingly, vigorously disagreed as to how the courts should *interpret* this "congressional abdication." *Fray*, 960 F.2d at 1376. The Court in *Fray* characterized Congress' ensuing construction of the legislative history as follows:

> Demonstrating a sophisticated understanding of how judges dissect legislative history, congressional proponents of retroactivity argued that *Bradley*'s presumption of retroactivity would of course apply, while opponents argued with equal vigor that [*Bowen*]'s presumption of non-retroactivity would carry the day. The opposing sides also placed conflicting interpretive legal memoranda in the legislative record.

*Id.*

Indeed, these conflicting opinions are reflected in the various contributions to the Congressional Record submitted by individual members of Congress participating in the floor debates. In the Senate, the Republican view, expressed by Senator Danforth, was that the Act would apply prospectively only, *see* 137 Cong.Rec. S15483 (daily ed. Oct. 30, 1991), while the Democratic view, expressed by Senator Kennedy, was that the Act would apply retroactively. *See* 137 Cong.Rec. S15485 (daily ed. Oct. 30, 1991); 137 Cong.Rec. S15963 (daily ed. Nov. 5, 1991). The same divergence of opinion was expressed in the House of Representatives. *See* 137 Cong.Rec. H9548 (daily ed. Nov. 7, 1991) (statement of Rep. Hyde) ("[T]he Act and the amendments made by the Act ... will not apply to cases arising before the effective date of the Act."); 137 Cong.Rec. H9530 (daily ed. Nov. 7, 1991) (statement of Rep. Edwards) ("The intent of the sponsors is that ... the provisions of the bill be applied to pending cases except where the bill expressly provides otherwise."). Finally, Senator Danforth himself stated that courts interpret-

ing the Act should not look to the numerous and inconsistent statements by legislators, but rather should look to the language of the statute and should apply the appropriate rules of construction. *See* 137 Cong.Rec. S15325 (daily ed. Oct. 29, 1991) ("a court would be well advised to take with a large grain of salt floor debate and statements placed into the Congressional Record which purport to create an interpretation for [the 1991 Act].").[16]

This court concludes, as have so many of its honorable colleagues, that the 1991 Act's legislative history is hopelessly ambiguous with regard to whether the Act was intended to apply retroactively or prospectively only. *See, e.g., Mozee*, 963 F.2d at 934 ("A clear indication of congressional intent cannot be deciphered from the legislative history or the 1991 Act's language."); *Fray*, 960 F.2d at 1376 (legislative history not clear on issue of retroactivity); *Vogel*, 959 F.2d at 597 (same); *Bailey*, Order at 2 (same); *Curtis*, Order at 6–7 (same); *Long*, 784 F.Supp. at 889 (same). *See also, Van Meter*, 778 F.Supp. at 84 ("[T]he legislative history of the 1991 Act not only fails to provide any guidance on the question, but as the parties agree, it affirmatively leaves the issue in a state of total confusion."). Indeed, perhaps the only clear consensus to emerge from the legislative history is that the 1991 Act passed with agreement on all issues *except* that of retroactivity. *See* 137 Cong.Rec. S15483 (daily ed. Oct. 30, 1991) (interpretive memorandum submitted by principal sponsors Senators Danforth and Kennedy showing agreement on every issue except retroactivity).

Again, the court is aware of the possible argument that since Congress in the 1991 Act failed to include a provision specifically authorizing retroactive application, which certainly Congress knows how to do, and indeed has done in numerous prior statutes, they necessarily must have intended that the Act be applied prospectively only. Again, however, the court finds this argument to be negated by the fact that Congress expressly declined to adopt a pro-

---

**16.** The Court in *Fray*, cited *supra*, stated: "Though it appears that a greater number of legislators expressed the prospective-only view, that is hardly conclusive." 960 F.2d at 1376–77.

posed bill, submitted by the Bush Administration, which expressly provided for prospective only application. *See supra* p. 1169 and n. 11.

The court is also aware of the potential for arguing that the history of the 1991 Act itself stands as evidence of Congress' intent that the bill apply prospectively only. That is, the facts are that Congress drafted a bill expressly providing for retroactivity. The President refused to sign the bill, citing as his reason, *inter alia*, the bill's "unfair retroactivity rules." *President's Message to the Senate Returning Without Approval the Civil Rights Act of 1990*, 26 Weekly Comp.Pres.Doc. 1632, 1634 (Oct. 22, 1990). An attempted congressional override failed. The very next session, the House of Representatives drafted a second bill, also expressly providing for retroactive application. Realizing that the President would not sign such a bill, the Senate drafted a compromise bill, from which all retroactivity provisions had been deleted. This compromise bill passed in both the Senate and House. Finally, the President signed this compromise bill, which was completely silent on the issue of retroactivity, into law.

Proponents of this argument would assert that since Congress drafted a bill expressly providing for retroactive application, then intentionally deleted this provision, Congress necessarily must have intended for the bill to apply prospectively only. *See Immigration Naturalization Service v. Cardoza–Fonseca*, 480 U.S. 421, 442–43, 107 S.Ct. 1207, 1218–19, 94 L.Ed.2d 434 (1987) (" 'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.' ") (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 392–93, 100 S.Ct. 1723, 1742, 64 L.Ed.2d 354, *reh'g denied*, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1137 (1980) (Stewart, J. dissenting)) (also citing *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974) (where provisions previously included in a bill are deleted prior to passage,

that congressional shift "militates against a judgment that Congress intended a result that it expressly declined to enact."); *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) ("[I]t is generally presumed that Congress acts intentionally and purposely in the ... inclusion or exclusion [of statutory provisions].")). *See also, Div. 998, Amalgamated Ass'n of Street Employees v. Wis. Employment Relations Bd.*, 340 U.S. 383, 392 n. 15, 71 S.Ct. 359, 364 n. 15, 95 L.Ed. 364 (1951) (President's successful veto of a bill followed by passage of a similar bill in a subsequent session, but without the language to which the President objected, indicates that the objectionable language was expressly rejected); *Maddox v. Norwood Clinic, Inc.*, 783 F.Supp. 582, 585 (N.D.Ala. 1992) ("When Congress wants a bill to apply retroactively, it is capable of saying so in plain, unequivocal language."). *See generally*, Note, *The First Words: The President's Place in "Legislative History"*, 89 Mich.L.Rev. 399, 412 (1990) ("Although a successful [presidential] veto means that the original bill never becomes law, a similar bill may well be passed later in its stead. If the President signs the subsequent bill, courts should be able to use the President's veto message from the original bill to infer that the later bill takes into account the objections and policy preferences of the President.") (footnote omitted).

Indeed, the Eighth Circuit Court of Appeals in *Fray* found this argument compelling. The Court stated:

Here, the President vetoed a bill containing an explicit retroactivity provision. That veto could not be overridden and a compromise bill omitting those provisions was then enacted. Whatever ambiguities may be found elsewhere in the Act and its legislative history, we think this is dispositive.

960 F.2d at 1378. The Court concluded: "When a bill mandating retroactivity fails to pass, and a law omitting that mandate is then enacted, the legislative intent was surely that the new law be prospective

only; any other conclusion simply ignores the realities of the legislative process." *Id.*

Nevertheless, this court is unpersuaded, due to the many conflicting statements made by the various Senators and Representatives during the floor debates, as well as Congress' express refusal to accept the Bush Administration's proposed bill expressly providing for prospective only effect. Rather, in light of the total situation surrounding the drafting and enactment of the 1991 Act, this court merely views the removal of the original retroactivity provisions as an act of compromise by members of Congress who, understandably, very much wanted to obtain the President's signature on this second bill. In order to reach this goal, they either had to accept the Bush Administration's proposal, and make the bill expressly prospective in effect—to which the Democratic side voiced strong objection—or simply delete the offending retroactivity provisions, and leave the retroactivity decision to the courts. By their own admission, members of Congress apparently saw this second alternative as the lesser of evils, and accordingly deleted the retroactivity provisions. In light of this ambiguous legislative history, this court does not view the actual deleting itself of the retroactivity provisions in question as dispositive evidence one way or the other.

As the court struggles to interpret the 1991 Act, also of some interpretive authority is the construction given the Act by the Equal Employment Opportunity Commission ("EEOC"). On December 27, 1991, in response to the uncertainty attending the enactment of the 1991 Act, and specifically with regard to the retroactivity issue, the EEOC, pursuant to Executive Order 12067, issued its "Policy Guidance on Retroactivity of Civil Rights Act of 1991." That document states as its purpose "to provide guidance on whether the compensatory and punitive damages provisions of the Civil Rights Act of 1991 apply to pending charges and to conduct occurring prior to the effective date of the Act." After discussing the particular damages provisions in question, the Act's language and legislative history, and the conflicting Supreme Court precedents, the EEOC concluded:

> *Bowen* represents the Supreme Court's more recent holding on this issue, and the Commission will follow the dictates of that case with regard to the retroactivity of the damages provisions. Accordingly, the Commission will not seek damages in charges filed prior to enactment of the Act, or in post-Act charges that challenge pre-Act conduct.... *[T]he Commission will not seek damages under the Civil Rights Act of 1991 for events occurring before November 21, 1991.*

EEOC Policy Guidance on Retroactivity of Civil Rights Act of 1991, 1 Daily Lab.Rep. (BNA) D-1, D-2 (Jan. 2, 1992) (emphasis added).

As the agency charged with the administration of all civil rights statutes, the EEOC's interpretation of the 1991 Act must be accorded substantial weight. "Generally, absent clear legislative intent, the construction given a statute by the agency that administers it is entitled to deference, provided it is reasonable." *Vogel*, 959 F.2d at 598. Moreover, the Supreme Court has held that where

> Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 [94 S.Ct. 1055, 1072, 39 L.Ed.2d 270] (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they

are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Chevron U.S.A., Inc. v. Natural Res. Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694, *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984) (footnotes omitted). *See also, United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961) ("If [the agency's] choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.").

In *Vogel,* as here, the Sixth Circuit Court of Appeals was faced with the question of the propriety of retroactive application of the 1991 Act to a pending case. After examining the Act's language and legislative history, as well as the interpretation given the Act by the EEOC, the Court in *Vogel* concluded, "In light of the ambiguity of the statute on its face and the lack of congressional guidance, the EEOC's decision to apply the 1991 [A]ct prospectively appears reasonable." 959 F.2d at 598. Apparently based almost solely upon the EEOC's interpretation of the 1991 Act, the Court in *Vogel* held that retroactive application of the Act was impermissible. *Id.*

Nevertheless, the EEOC's interpretation of the 1991 Act has not gone unchallenged. In response to the EEOC's Policy Guidance, the United States Commission on Civil Rights ("CCR") on February 13, 1992 issued its "Memorandum of Law on the EEOC's Policy Guidance on the Application of Damages Provisions of the Civil Rights Act of 1991 to Pending Charges and Pre–Act Conduct." In a cover letter addressed to the Assistant Legal Counsel for the EEOC, the Staff Director of the CCR explained the CCR's function as follows:

The United States Commission on Civil Rights (Commission) is an independent, bipartisan agency of the Federal Government established to review legal developments, and appraise Federal policies, involving discrimination or a denial of equal protection. In fulfilling this mission, the Commission holds hearings and submits reports containing findings and recommendations to the President and Congress.

In carrying out those statutory responsibilities, the Commission is vested with both the authority and duty to appraise the policies of any and all Federal entities relative to the Federal civil rights enforcement effort, and to monitor the effectiveness of agency programs in the enforcement of civil rights laws.

Cover letter dated February 13, 1992 from Wilfredo J. Gonzalez, Staff Director of the CCR, to Dianna B. Johnston, Assistant Legal Counsel, Office of Legal Counsel, Title VII/EPA Division, EEOC, p. 1, ¶¶ 1–2.

In its Memorandum of Law attached to that cover letter, the CCR closely examined the language and legislative history of the 1991 Act, the conflict between the two lines of Supreme Court precedent, relevant conclusions drawn by the various circuit courts of appeals, and the EEOC's Policy Guidance. In summarizing the CCR's conclusions, Mr. Gonzalez concluded his letter to Ms. Johnston thus:

In summary, the Commission's legal analysis, for the reasons discussed more fully in the attached Memorandum of Law, concludes that the EEOC's policy guidance is erroneous in that it misconstrues time honored principles of statutory construction, overlooks significant judicial interpretation of statutory language similar to that in the 1991 Civil Rights Act, and fails inexplicably to distinguish the Supreme Court cases of *Bradley v. School Board of Richmond* and *Bowen v. Georgetown University Hospital.* Furthermore, the EEOC, having acknowledged the existence of considerable judicial precedent supportive of the applicability of the damages provisions of the Act to pending charges and

pre-Act conduct, and having failed to provide sufficient justification for not seeking to avail itself of those stronger remedies, would appear through the execution of such policy to fall far short of traditional standards of aggressive statutory enforcement required by its enabling legislation and Executive Order 12067. The EEOC, therefore, should rescind and restructure its proposed policy guidance in accordance with applicable judicial precedent.

Cover letter dated February 13, 1992, pp. 1–2, ¶ 4.

This court views both the EEOC's Policy Guidance and the CCR's Memorandum of Law as persuasive authority in reaching its own conclusions with regard to the proper interpretation of the 1991 Act. Nevertheless, this court, contrary to the Court in *Vogel*, sees neither agency interpretation as dispositive of the issue, and indeed finds that read together, they shed little light on this very muddled situation.

### 3. Analysis under Bowen and Bradley

In the face of both statutory language and legislative history which are ambiguous, the court necessarily must employ one of the presumptions enumerated by the Supreme Court in order to determine whether a statute is to apply retroactively or prospectively only. Given the lack of clear precedent within this circuit, as well as the discretionary nature of the method employed by this court with regard to choosing between two conflicting circuit court opinions, such a determination in the instant case necessitates this court's directly addressing the conflict between *Bowen* and *Bradley*.

#### a. Analysis under Bowen

As stated before, the basic rule enumerated in *Bowen*, and reiterated as the law of this circuit in *Wright*, provides that "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen*, 488 U.S. at 208, 109 S.Ct. at 471. This court has already determined that in the instant case, the language of the 1991 Act is ambiguous with regard to retroactivity. The court likewise has determined that the Act's legislative history is hopelessly unclear with regard to that issue. Thus, if this court were to proceed under the presumptive rule enumerated in *Bowen* and *Wright*, it is clear that the 1991 Act must be deemed to have only prospective effect, and thus not to warrant the relief requested by Plaintiff in the instant case.

#### b. Analysis under Bradley

The analysis is not so simple, however, under the rule of construction enumerated in *Bradley*. As stated before, the basic rule stated by the Supreme Court in *Bradley*, and reiterated as the law of this circuit in *Peppertree*, provides that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016.

At the outset, this court notes that there currently exists a great deal of controversy within this district with regard to whether *Peppertree* is still binding precedent within this circuit on the issue of retroactive application of statutes. With regard to that case, the following question was presented to the Supreme Court on petition for writ of certiorari from the Eleventh Circuit Court of Appeals' prior decision: "Whether the court of appeals correctly held that an amendment to the penalty provisions of the National Housing Act applied retroactively." *See Bailes v. United States*, 1075, Memorandum for the United States, filed April 1, 1992, p. (I). Thereafter, in his Memorandum for the United States, filed with the Supreme Court on April 1, 1992, the Solicitor General of the United States informed the Supreme Court that "[t]he United States ha[d] determined not to pursue its claim for relief for 'double damages' under the new statute," but rather would "seek compensatory damages under a contract theory" not involving the new statute. *Id.* at 4. Accordingly, the Solicitor General concluded: "Because the government is no longer seeking relief under the new stat-

ute, that claim for relief—which is the sole basis for the petition for a writ of certiorari—is moot." *Id.* (citations omitted).

Accordingly, on April 27, 1992, the Supreme Court in *Bailes v. United States,* —— U.S. ——, 112 S.Ct. 1755, 118 L.Ed.2d 419 (1992), vacated the judgment in *Peppertree* and remanded the case

> to the United States Court of Appeals for the Eleventh Circuit with instructions to remand the case to the United States District Court for the Northern District of Alabama with instructions to vacate with prejudice that aspect of the district court's award that represents the "doubling" of damages as suggested by the Solicitor General in his brief for the United States filed April 1, 1992, and for further appropriate proceedings.

Presently, it is unclear what, if any, precedential value may still be gleaned from the now vacated *Peppertree.* Plaintiffs seeking retroactive application of the 1991 Act argue that since *Peppertree* was remanded expressly in response to the government's withdrawal of its claim for double damages, the Supreme Court's April 27, 1992 decision vacating *Peppertree* was not on the merits, and thus leaves *Peppertree,* and its progeny, as valid precedent within the Eleventh Circuit on the issue of retroactive application of statutes. On the other hand, defendants seeking to prevent retroactive application of the 1991 Act argue that *Peppertree* was vacated; period. That is, they argue that since *Peppertree* was vacated and remanded on the very issue—double damages—presumably calling into question the Eleventh Circuit's retroactive application of the statute in question, *Peppertree,* and its progeny, may no longer be viewed as binding precedent within this circuit with regard to that issue.

■ The court at present need not attempt to reconcile this conflict of opinion, since this court concludes that in the instant case, under either *Bowen* or *Bradley,* retroactive application of the 1991 Act is impermissible. As an aside, however, the court does note that: (1) *Wright* was considered binding precedent within the Eleventh Circuit well before *Peppertree* was even decided; (2) the Court in *Peppertree* chose not to follow the long-standing principles of statutory construction reiterated in *Bowen* and *Wright,* and instead promoted, with relatively little discussion, the *Bradley* line of cases as being the "new" precedent within this circuit; (3) *Peppertree* has now been vacated and remanded to the district court on the very issue—double damages—presumably calling into question the Eleventh Circuit's retroactive application of the 1991 Act pursuant to *Bradley,* and is therefore at best of questionable precedential value on that issue pending the Eleventh Circuit's restatement of its position; and (4) *Wright* remains good law within the circuit, and therefore currently stands as the Eleventh Circuit's only unquestioned statement of precedent on the issue of retroactivity. Given these facts, it is this court's opinion that currently, courts within this circuit are at least arguably required to follow, not *Bradley,* as so many of its esteemed colleagues have done,[17] but rather *Bowen,* as applied to this circuit in *Wright.*

As a result, it is this court's position at the outset that the following analysis under *Bradley* and *Peppertree* may in fact be extraneous to the instant disposition, given the current status of the law within this circuit. It is furthermore this court's opinion that as a result of the Supreme Court's having vacated *Peppertree,* the numerous decisions recently handed down by the

**17.** *See, e.g., Bailey v. Am. Int'l Adjustment Co.,* Civ.Action No. 1:91–cv–1524–RLV (N.D.Ga. April 20, 1992) (Vining, J.), Order at 2; *Glanton v. Henkel Chem. Corp.,* Civ.Action No. 4:91–cv–119–HLM (N.D.Ga. April 2, 1992) (Murphy, J.), Order at 5; *Gilbert v. Milliken & Co.,* 794 F.Supp. 376 (N.D.Ga.1992) (Tidwell, J.), Order at 2; *Curtis v. Metro Ambulance Serv., Inc.,* Civ.Action No. 1:89–CV–1867–JOF (N.D.Ga. March 25, 1992) (Forrester, J.), Order at 18; *Leatherwood v. Eastman Kodak Co.,* Civ.Action No. 1:89–cv–264–HTW (N.D.Ga. March 23, 1992) (Ward, J.), Order at 2; *Jones v. Dekalb County,* Civ.Action No. 1:90–cv–2262–HTW (N.D.Ga. March 19, 1992) (Ward, J.), Order at 3–4; *Carmichael v. Fowler,* Civ.Action No. 1:88–cv–969–HTW, 1992 WL 120353 (N.D.Ga. March 11, 1992) (Ward, J.), Order at 2; *Long v. Carr,* 784 F. Supp. 887, 890 (N.D.Ga.1992) (Freeman, J.).

courts in this district, the majority of which relied upon *Peppertree* in applying *Bradley* to the instant situation—and all of which were decided prior to the Supreme Court's April 27, 1992 decision vacating *Peppertree*—are presently of equally questionable precedential weight.[18, 19]

Nevertheless, as stated before, this court realizes that although the above scenario represents this individual court's interpretation of the situation, that interpretation may not be shared by all esteemed members of the bench. Therefore, the court will proceed to analyze the instant situation pursuant to *Bradley* and *Peppertree*, for the time-being ignoring this court's suspicion that that line of precedent currently may be inapplicable. Nevertheless, the court finds that even if it were to apply the rule enumerated in *Bradley* and *Peppertree*, this court's disposition of Plaintiff's instant Motion would not change. Again, the basic rule stated by the Supreme Court in *Bradley*, and reiterated as the law of this circuit in the now vacated *Peppertree*, provides that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016. This court has already determined that both the statutory language and the legislative history of the 1991 Act are ambiguous with regard to retroactivity. Thus, if this court were to employ the presumptive rule enumerated in *Bradley* and *Peppertree*, it is clear that the 1991 Act must be deemed to have retroactive effect, and thus to allow Plaintiff's requested relief, "unless doing so would result in manifest injustice." In addition,

[t]he Eleventh Circuit has applied a "simplified" version of the *Bradley* "manifest injustice" test, holding that new statutes that affect antecedent rights will not apply retroactively, while those that affect only procedure or remedy will apply retroactively.

*Maddox v. Norwood Clinic, Inc.*, 783 F.Supp. 582, 583 (N.D.Ala.1992) (Hancock, J.) (citing *United States v. Fernandez–Toledo*, 749 F.2d 703, 705 n. 6 (11th Cir. 1985)). *See also, Doe v. Bd. of County Comm'rs*, 783 F.Supp. 1379, 1385 (S.D.Fla. 1992) (Highsmith, J.). According to the Court in *Fernandez–Toledo*, that test "is merely a 'simplification' of the three-part test used by the Supreme Court in *Bradley*." 749 F.2d at 705 n. 6 (citing *Watkins Motor Lines, Inc. v. Interstate Commerce Comm'n*, 641 F.2d 1183, 1186–87 n. 3 (5th Cir. Unit B 1981)).

It is this court's opinion that the simplified manifest injustice test employed by the Eleventh Circuit provides a desirable simplification of the *Bradley* three-part test, as well as a more logical framework for discussion. Nevertheless, for the sake of clarity and completeness, the court will first address the three factors as enumerated by the Court in *Bradley*, before providing a more complete discussion of the relevant issues by way of addressing the simplified test used in this circuit. *See* discussion, *infra* pp. 1182–86.

■ According to the Court in *Bradley*, the determination of whether manifest injustice would result from the retroactive application of the provision in question depends upon the court's analysis of the following three factors: "(1) the nature and identity of the parties, (2) the nature of

---

**18.** *See, e.g.,* cases cited *supra*, p. 1176 n. 17.

**19.** It is noteworthy, however, that a number of courts in this district have applied the *Bowen*, rather than the *Bradley*, rule to the instant situation. *See, e.g., Washington v. Int'l Business Machines Corp.*, Civ.Action No. 1:91–CV–1258–ODE (N.D.Ga. March 9, 1992) (Strother, M.J.) ("Like the panel in *Wright*, the magistrate judge agrees with the Supreme Court's pronouncement in *Bowen* that statutes should not be given retroactive effect absent a clearly expressed legislative

intent.") (holding that the 1991 Act is not to be applied retroactively); *Ihedioha v. Emro Marketing Co.*, Civ.Action No. 1:91–CV–2873–ODE, 1992 WL 176985, 1992 U.S.Dist.LEXIS 5217, 58 Fair Empl.Prac.Cas. (BNA) 106 (N.D.Ga. Jan. 29, 1992) (Chancey, M.J.) (same). In fact, this court in this very case has held that the 1991 Act "does not apply to cases arising before the effective date of the Act [Nov. 21, 1991]." *James v. Am. Int'l Recovery, Inc.*, Civ.Action No. 1:89–CV–321–RHH, 1991 WL 281734 (N.D.Ga. Dec. 3, 1991) (Hall, J.), Order at 1.

their rights, and (3) the nature of the impact of the change in law upon those rights." 416 U.S. at 717, 94 S.Ct. at 2019.

The court notes at the outset that the majority of courts in this district which have conducted such an analysis have determined that retroactive application of the 1991 Act to cases such as the instant one does not result in manifest injustice under the three-factor test enumerated in *Bradley. See, e.g., Bailey,* cited *supra,* Order at 5; *Glanton,* cited *supra,* Order at 6–7; *Gilbert v. Milliken & Co.,* 794 F.Supp. 376 (N.D.Ga.1992) (Tidwell, J.), Order at 3; *Curtis,* cited *supra,* Order at 10; *Leatherwood v. Eastman Kodak Co.,* Civ.Action No. 1:89–cv–264–HTW (N.D.Ga. March 23, 1992) (Ward, J.), Order at 2; *Jones v. Dekalb County,* Civ.Action No. 1:90–cv–2262–HTW (N.D.Ga. March 19, 1992) (Ward, J.), Order at 4; *Carmichael v. Fowler,* Civ.Action No. 1:88–cv–969–HTW, 1992 WL 120353 (N.D.Ga. March 11, 1992), Order at 2; *Long,* cited *supra,* 784 F.Supp. at 891. Nevertheless, this court, again undertaking its own independent analysis, concludes that retroactive application of the 1991 Act in the instant case indeed would result in manifest injustice under the three-part *Bradley* test.

i. *Nature and Identity of the Parties*

First, with regard to the nature and identity of the parties, the Court in *Bradley* noted a distinction between "mere private cases between individuals" and those, like *Bradley,* involving "publicly funded governmental entit[ies]." 416 U.S. at 718, 94 S.Ct. at 2019. Again, *Bradley* was a school desegregation case, the litigation of which extended over a period of some thirteen years. The Court concluded that "[w]ith the [School] Board [defendant] responsible for the education of the very students who brought suit against it to require that such education comport with constitutional standards, it is not appropriate to view the parties as engaged in a routine private lawsuit." *Id.*

The Court in *Bradley* next proceeded to consider its own previous decision in *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). *Newman* involved application of §§ 718 and 204(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000a–3(b), which provided for an award of attorney's fees to a successful plaintiff under the public accommodation subchapter of that Act. In *Newman,* the Court distinguished civil rights plaintiffs from other types of plaintiffs by recognizing that civil rights plaintiffs conduct private litigation in order to effect a great public good, thus proceeding essentially as " 'private attorney[s] general' " for the betterment of society as a whole. 416 U.S. at 719, 94 S.Ct. at 2020. (quoting *Newman,* 390 U.S. at 401–402, 88 S.Ct. at 965–966). The Court in *Newman* further held that " '[i]f successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts.' " *Id.* (quoting *Newman,* 390 U.S. at 401–402, 88 S.Ct. at 965–966).

Next, the *Bradley* Court relied upon its previous decision in *Schooner Peggy,* cited *supra,* in advancing the proposition that in " 'great national concerns' . . . the court must decide according to existing laws." *Bradley,* 416 U.S. at 719, 94 S.Ct. at 2020 (quoting *Schooner Peggy,* 5 U.S. (1 Cranch) at 110, 2 L.Ed. at 51). The Court in *Bradley,* as in *Newman,* concluded that since the litigation there presented issues of "great national concern," the retroactive application of an attorney's fees provision to a protracted civil rights litigation would not, due to the nature of the parties involved, result in manifest injustice.

Relying upon this analysis in *Bradley,* numerous courts in this district construing the 1991 Act have concluded that this first *Bradley* factor militates in favor of a finding of no manifest injustice from its retroactive application in cases such as the instant one. *See, e.g., Glanton,* Order at 6; *Curtis,* Order at 8–9; *Long,* 784 F.Supp. at 890. In both *Glanton* and *Curtis,* the Court's determination was based upon its conclusion that the basis of the claim asserted by the plaintiff was of great national and/or public concern. *See Glanton,* Order at 6 ("[A]lthough this case involves

private parties, the retroactive application of these amendments is of national concern because any changes to Title VII cases are inherently national in scope.") (citations omitted); *Curtis*, at —— ("Regarding the first factor, the court finds that an employee's interest in being free from discrimination in the work place is a matter of great public concern.") (citing *Bradley*, 416 U.S. at 492, 94 S.Ct. at 719, *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1554 (11th Cir.), *cert. denied*, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984)). The Court's decision in *Long* was based upon that Court's finding that since that particular case involved both the Nuclear Regulatory Commission, an administrative agency of the federal government, and an issue of great national concern, no manifest injustice would result from retroactive application of the 1991 Act.

This court feels compelled to disagree with its esteemed colleagues' interpretations of the first *Bradley* factor, at least as that factor relates to the instant situation. Specifically, this court disagrees with the interpretations of the first *Bradley* factor provided by the Courts in *Glanton* and *Curtis*. In *Bradley*, the Supreme Court was faced with applying the first factor to a set of essentially very narrow facts. Thus, its resulting conclusion must necessarily be limited to those same narrow facts. Basically, the Court in *Bradley* established that: (1) civil rights plaintiffs, (2) *alleging intentional discrimination by a "publicly funded governmental entity"*, (3) are in effect proceeding as "private attorneys general," (4) thus individually incurring all resulting expenses, (5) in order to effect a great public good by advancing the legislative purpose behind all civil rights legislation, (6) and thus are litigating an issue of "great national concern," (7) which therefore justifies a retroactive award of attorney's fees to those plaintiffs. This court respectfully finds that in interpreting and applying the first *Bradley* fac-

tor to cases involving the 1991 Act, the Courts in *Glanton* and *Curtis* overstate and impermissibly extend the grounds upon which the *Bradley* holding was based.

That is, the Courts in *Glanton* and *Curtis* apparently construe *Bradley* as holding that *any time* a plaintiff proceeds pursuant to civil rights legislation, that plaintiff necessarily advances an issue of "great national concern," so as to militate against a finding of manifest injustice from retroactive application of that legislation. Instead of following the lead of these Courts, however, this court chooses to construe the *Bradley* holding much more narrowly.[20] That is, this court construes *Bradley* as *absolutely* mandating only a finding of "great national concern" in cases in which a plaintiff alleges intentional discrimination *by a publicly funded governmental entity*.

To restate this court's position, it is this court's opinion that the holding in *Bradley*, due to the particular facts of that case, necessarily must be limited to the situation in which a plaintiff alleges intentional discrimination by a publicly funded governmental entity rather than a private entity. Indeed, the Court in *Bradley* expressly distinguishes between " 'mere private cases between individuals' " and those involving "a publicly funded governmental entity," thus indicating that its holding with regard to the first factor at the very least *may* have been different had the defendant in that case been a private rather than a public entity. 416 U.S. at 718, 94 S.Ct. at 2019. Although acknowledging that the mere fact "[t]hat the circumstances involve private parties only ... does not preclude retroactive enforcement [of new legislation]", the Court in *Mojica v. Gannett Co.*, 779 F.Supp. 94, 97, 57 Fair Empl.Prac.Cas. (BNA) 537 (N.D.Ill.1991) noted that if the case "only involv[es] private concerns, then a court should be more reticent in applying a new statute retroactively if there is an

---

**20.** According to the Court in *Mozee*, cited *supra*, "*Bradley*'s precedent on appeal will ... apply only to cases with a factual backdrop similar to that in *Bradley*." 963 F.2d at 938. Although the present case is not at present technically "on

appeal," this court deems the sentiment expressed by the Court in *Mozee* to be applicable, since Plaintiff in her present Motion in effect "appeals" the trial findings of the Magistrate Judge.

**1180**

undue impact on the parties' previously existing rights or relationship."

Lest this court's present holding be misconstrued, it is not this court's position that allegations of intentional discrimination by a private entity necessarily *do not* involve matters of great national concern. Such a finding would be contrary to the purposes behind all civil rights legislation, not to mention being repugnant to the basic notions of human equality and dignity to which this court strongly subscribes.

■ Rather, this court merely attempts to limit *Bradley* to the narrow facts upon which it was based in concluding that that case mandates only that allegations of discrimination *by a publicly funded governmental entity* may be *presumed, automatically,* to present an issue of great national concern. That conclusion, however, does not dispose of the issue. Rather, the court must next determine if, given the specific facts of *this* case, Plaintiff, as a civil rights plaintiff alleging intentional discrimination by a private entity, presents issues of great national concern, so as to support a finding of no manifest injustice from retroactive application of the 1991 Act to her case.

Nevertheless, the court finds that at the present time, it is not necessary for the court to address that issue. In light of this court's having concluded that both the second and third factors of the *Bradley* manifest injustice test militate in favor of a finding of manifest injustice from retroactive application of the 1991 Act in the instant case, *see infra,* any additional analysis of the first factor is unnecessary.

ii. *Nature of the Parties' Rights*

"The second aspect of the Court's concern that injustice may arise from retrospective application of a change in law relates to the nature of the rights effected by the change." *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020. "The Court has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional." *Peppertree,* 942 F.2d at 1561 (citing *Bradley,* 416 U.S. at 720, 94 S.Ct. at

2020). Thus, with regard to this second factor, the court must determine whether retroactive application of the Act would deprive either party of a "matured or unconditional right." *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020.

Again, the Courts in *Glanton, Curtis* and *Long* concluded that as regards the 1991 Act, consideration of this second factor in those cases militates in favor of retroactive application. Those Courts determined that since the specific provisions of the 1991 Act, namely, the damages and jury trial provisions, invoked by the plaintiffs in those cases necessarily were remedial in nature, and affected procedural, rather than substantive, rights, no manifest injustice would result from retroactive application in those cases. *See Glanton,* Order at 7 (retroactive application of the Act's jury trial provision "would not infringe upon any of the parties['] unconditional rights because Defendant does not have an unconditional right to a particular type of trial and because it would not affect what they have to show at that trial."); *Curtis,* Order at 9 (retroactive application of the Act's damages and jury trial provisions would not infringe upon any of the parties' unconditional rights, due to the fact that "[t]he defendants had no matured or unconditional right to engage [in] the alleged discrimination and retaliation", since "[s]uch conduct was already proscribed by Title VII. Further, the right to a bench, rather than a jury trial, is not substantive. The right to have a case heard before a particular tribunal is only procedural.") (citations omitted); *Long,* 784 F.Supp. at 891 ("[A]llowing plaintiff to amend the Pretrial Order to add a claim for compensatory damages and to try her case before a jury will not deprive defendant of a matured or unconditional right. Certainly, defendant retains the right to introduce all admissible evidence and to fully present his case at trial.").

Again, this court respectfully disagrees with the holdings of *Glanton, Curtis* and *Long,* at least as they apply to pending cases which have been *tried* on the *merits* rather than those *in which* the plaintiff

seeks to add claims prior to the initial trial of the matter. Admittedly, this court agrees that a defendant may not be said to have a matured or unconditional right to discriminate, nor does the defendant have a matured or unconditional right to be heard by any particular tribunal. Indeed, this court would take that position even further in acknowledging that while it is possible to argue that a defendant has a right to choose his actions based upon the possible ramifications, i.e., the possible damages to be awarded in case of litigation, that position, too, runs contrary to the basic, indisputable truth that a defendant has no "right" to discriminate, period.

█ That having been acknowledged, this court nevertheless disagrees with prior cases holding that retroactive application of the damages and jury trial provisions of the 1991 Act as a result affects *no* matured or unconditional rights of the parties, at least insofar as retroactive application is sought, as here, subsequent to a full trial of the matter. While a defendant in a civil rights case admittedly has no right to discriminate, that defendant clearly has a right to be tried only once for the same alleged offense. This conclusion is virtually mandated by the courts' well established and longtime adherence to notions of res judicata and collateral estoppel.

Moreover, this basic principle is firmly rooted in fundamental notions of fairness. Clearly, to require a defendant, after completing a full trial on the merits and receiving a resulting judgment, to virtually start over and be tried yet again on essentially the same claims, and thus to incur literally double the expected fees and expenses, strikes this court as clearly fundamentally unfair and, as a result, manifestly unjust. General notions of fairness have numerous times been applied by various courts to the very situation at hand to determine that requiring a second trial of a given matter does, in fact, work a fundamental, and thus manifest, injustice on the defendant. *See, e.g., Bonjorno,* 494 U.S. at 855, 110 S.Ct. at 1586 (Scalia, J., concurring) (rejecting *Bradley*'s "presumption of retroactivity" on the grounds that such a presumption "is

contrary to fundamental notions of justice", while "[t]he principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal."); *Mozee,* 963 F.2d at 937 ("[W]here the parties have already litigated the issues on appeal, the retroactive application of a procedural provision could require a new trial and could, therefore, require double expenses. It appears that in most appeals such a retrial would rise to the level of manifest injustice, thereby rendering the *Thorpe–Bradley* rule inapplicable.") (citing *Bradley,* 416 U.S. at 716, 94 S.Ct. at 2018).

The Court in *Sorlucco v. N.Y. City Police Dep't,* 780 F.Supp. 202 (S.D.N.Y.1992) (Murkasey, J.), agreed:

> [N]either authority nor common sense suggests that the amended statute should be applied to a case not merely pending, but already tried on the assumption that the Title VII issues would be decided by the court.... Injustice certainly would result from denying to defendant retroactively the right to be aware that plaintiff's Title VII claim would be decided by the jury and to frame its defense and fashion its arguments accordingly.

*Id.* at 213 (holding that since "manifest injustice" would result from retroactive application of § 102 of the 1991 Act in that case, such retroactive application was impermissible under *either Bradley* or *Bowen* ).

In the instant case, the Magistrate Judge conducted a full, two-day trial on the merits, and determined that Plaintiff's claims were not supported by the evidence. In keeping with the sentiment expressed by Justice Scalia in *Bonjorno,* as well as by the Courts in *Mozee* and *Sorlucco,* this court finds that to require Defendant to conduct—and incur the expenses related to—a *second* trial, which moreover would be before a jury, for which Defendant presumably did not prepare, clearly would be manifestly unjust.

Moreover, the court notes that in the instant case, Plaintiff invokes § 101(2)(b) of

the Act, thereby seeking reinstatement of her § 1981 claim. Clearly, where a statute provides a cause of action where none existed previously, application of that statute must be said to affect the unconditional rights of the parties. *See* discussion, *infra* pp. 1183–84.

### iii. *Nature of the Impact of the Change in Law Upon the Parties' Rights*

Finally, with regard to the third *Bradley* manifest injustice factor, the court must consider whether retroactive application would result in " 'a new and unanticipated obligation ... be[ing] imposed upon a party without notice or an opportunity to be heard.' " *Peppertree*, 942 F.2d at 1561 (quoting *Bradley*, 416 U.S. at 720, 94 S.Ct. at 2021). As with the second factor, the Courts in *Glanton, Curtis* and *Long* essentially determined that since the defendants there were at all times under an obligation not to discriminate, mere changes in the damages to be allowed as a result of such proscribed discrimination, or in the trial forum before which the case was to be tried, resulted in no such "new and unanticipated obligation[s]" being imposed upon the defendants so as to necessitate a finding of manifest injustice to result from retroactive application. *See Glanton*, Order at 7 ("[T]hese changes [made by the 1991 Act] do not manifestly change the nature of Title VII because it was illegal to sexually discriminate prior to the enactment of these provisions, just as it is still illegal to discriminate after these changes.") (citations omitted); *Curtis*, Order at 10 ("[T]he damages portion of the [1991 Act] imposes no new obligation on defendant. 'Instead, it imposes an additional remedy on already proscribed conduct.' Defendant still has an opportunity to be heard and to introduce evidence in support of his case.") (quoting *Peppertree*, 942 F.2d at 1561); *Long*, 784 F.Supp. at 890 ("[T]he alleged misconduct by defendants was proscribed at the time it allegedly occurred. Under *Peppertree,* no new obligation or standard has been imposed on the defendants.").

■ For virtually the same reasons stated with regard to the second factor, this court respectfully disagrees. The court acknowledges that a defendant in a civil rights case is at all times obligated not to discriminate. Thus, the court agrees with the holdings in *Glanton, Curtis* and *Long* as far as they go. However, once again, this court finds that, at least where a plaintiff seeks amendment subsequent to a full trial on the merits, the determination of whether an unanticipated obligation is being imposed upon the defendant, in order to comport with fundamental notions of fairness, necessarily must encompass an analysis of whether the necessity for a second trial itself, with the incurrence of related fees and expenses and the necessary alteration in case preparation, imposes upon Defendant such an "unanticipated obligation." This court finds that in the instant case, it does.

The court finds, as it did with the second factor, that to argue—following a full trial on the merits and the handing down of a decision of the matter—that requiring the defendant to virtually start over and defend itself a second time against essentially identical claims, imposes no unanticipated obligation upon that defendant, ignores not only the reality of the judicial system, but also the parties' reliance upon such well established protections as that embodied in notions of res judicata and collateral estoppel. *See supra* p. 1181.

As with the second factor, the court is furthermore persuaded by the fact that Plaintiff in the instant case seeks to invoke § 101(2)(b) of the Act to reinstate her § 1981 claim. Again, where a statute provides a plaintiff with a cause of action which previously did not exist, clearly the application of that statute imposes "a new and unanticipated obligation" upon the defendant. *See* discussion, *infra* pp. 1183–84.

### iv. *Eleventh Circuit Simplified Bradley Manifest Injustice Test*

As stated before, the Eleventh Circuit has "simplified" the three-part manifest injustice test enumerated in *Bradley* by holding simply that "new statutes that affect antecedent [or substantive] rights will not apply retroactively while those that affect

only procedure or remedy will apply retro-actively." *Fernandez–Toledo,* 749 F.2d at 705 (citing *United States v. Vanella,* 619 F.2d 384, 385–86 (5th Cir.1980)); *Doe v. Bd. of County Comm'rs,* 783 F.Supp. 1379, 1385, 58 Fair Empl.Prac.Cas. (BNA) 809 (S.D.Fla.1992) (Highsmith, J.); *Maddox v. Norwood Clinic, Inc.,* 783 F.Supp. 582, 583 (N.D.Ala.1992) (Hancock, J.). As stated before, this court finds that this test represents a desirable simplification of the *Bradley* three-part test, and furthermore that this test adequately addresses the concerns underlying the *Bradley* "manifest injustice" analysis. In setting forth the three-part "manifest injustice" test, the Court in *Bradley* in effect was compelling courts to distinguish between substantive rights, the retroactive alteration of which necessarily would result in "manifest injustice," and procedural or remedial rights, the retroactive alteration of which presumably would not result in "manifest injustice." In addition, the simplified version utilized in this circuit avoids the often technical distinctions between the parties' "rights" and "burdens" inherent in the *Bradley* three-part test. That is, the simplified Eleventh Circuit test allows for a single, less technical analysis of the three *Bradley* factors, which factors frequently overlap so as to make discussion of each as a separate consideration both difficult and confusing. The court thus finds that the simplified test provides a logical framework which is more conducive to this court's instant analysis. The *Bradley* three-part test, in contrast, requires that the court repeat essentially the same arguments with regard to the second and third factors, which indeed this court has done. *See supra,* pp. 1180–82. It is for this reason that the court, in discussing the *Bradley* three-part test above, provided several references to the following discussion.

■ As mentioned before, it is this court's opinion that § 101(2)(b) of the Act, which Plaintiff in the instant case seeks to invoke in order to reinstate her § 1981 claim, indeed affects the substantive rights of the parties so as to make its retroactive application manifestly unjust and, as a re-sult, impermissible under *Bradley.* It is clear that where a statute provides a distinctly new cause of action to a plaintiff where none previously existed, that statute must be considered substantive in nature. According to the Court in *Doe,* cited *supra,*

> [b]y expressly expanding the applica-bility of § 1981 to the performance and termination of contracts, including employment contracts, the 1991 Act creates a new statutory cause of action—a new right—for employees ... who claim racially discriminatory employment treatment and termination. This new employee right, in turn, alters the standard for measuring employers' conduct in employment termination, thereby creating a new source of liability for employers.

783 F.Supp. at 1384. Accordingly, the Court in *Doe* held that § 101(2)(b) of the 1991 Act could not be retroactively applied so as to allow the plaintiff in that case to amend her complaint by adding a claim under § 1981.

Shortly thereafter, the Court in *Maddox,* cited *supra,* agreed:

> The [1991] Act, overruling *Patterson,* extends Section 1981 to conduct to which it did not previously apply. The new provisions create a cause of action for post-formation discrimination (e.g., demotion, discharge, harassment and certain promotions). *See* S.1745 Sec. 101(2)(b). Thus, employers are now exposed to liability for conduct which, prior to the passage of the Act, was not proscribed by Section 1981. *More significantly, employers with less than fifteen employees are now exposed to claims for post-contract racial discrimination, claims which previously could not have been asserted against such employers under Section 1981, Title VII or anV other federal statute.*

783 F.Supp. at 586 (emphasis in original).

This court agrees with the Courts in *Doe* and *Maddox.* Inasmuch as Plaintiff seeks retroactive application of § 101(2)(b) of the Act in order to reinstate her § 1981 claim, that provision, providing to Plaintiff a new and distinct cause of action, greatly affects

the substantive rights of the parties, making its retroactive application manifestly unjust, and therefore impermissible under *Bradley.*

In addition to her requested application of § 101(2)(b) of the 1991 Act, Plaintiff also seeks application of § 102 of the Act in order to allow her to add claims for compensatory and punitive damages, as well as to reinstate her demand for jury trial. Very recently in *Sudtelgte v. Sessions,* 789 F.Supp. 312 (W.D.Mo.1992) (Sachs, C.J.), the Court held that §§ 102(a) and (b) of the 1991 Act, providing for compensatory and punitive damages, are "substantive in nature and should therefore be applied prospectively only." *Id.,* 789 F.Supp. at 315. The Court further found that because

> the right to a jury trial in Title VII cases under Section 102 of the new statute turns on whether or not the plaintiff may assert a claim for compensatory damages ... it follows that because the plaintiff cannot assert a compensatory damages claim, the plaintiff may not properly assert a jury demand for the assessment of such damages under § 102 of the 1991 Act.

*Id.* Accordingly, the Court in *Sessions* found that retroactive application of § 102 in that case was impermissible as affecting the substantive rights of the parties.

This view of § 102 as substantive in nature is shared by a number of courts recently faced with the question. *See, e.g., Mozee,* 963 F.2d at 939 n. 6 ("[P]unitive damage provisions, which are aimed at deterring future conduct, arguably impact substantive rights.") (stating that this is particularly true where the newly enacted statute provides for punitive damages where none were previously available, as opposed to merely altering the *amount* of punitive damages recoverable); *Tyree v. Riley* 783 F.Supp. 877, 58 Fair Empl. Prac.Cas. (BNA) 361 (D.N.J.1992) (Lechner, J.) ("[R]etroactive application of section 102 would result in a manifest injustice ... [since] the right to compensatory damages imposes a new obligation on a defendant

which did not exist prior to the 1991 Civil Rights Act."); *Johnson v. Rice,* No. 2:85–CV–1318, 1992 WL 16284, 1992 U.S.Dist.LEXIS 830 *10, 1992 WL 16284, 58 Fair Empl.Prac.Cas. (BNA) 31, 34 (S.D.Ohio, Jan. 24, 1992) (King, M.J.) (Section 102 of the 1991 Act "clearly 'creates a new liability in connection with a past transaction' ... and leads to the inescapable conclusion that the compensatory damages provision of the 1991 Act is substantive in nature, and to be applied prospectively only."); *Van Meter v. Barr,* 778 F.Supp. at 84 ("A right to seek compensatory damages in a jury trial against the United States is a major substantive provision.").[21]

This court finds the above authorities to be very persuasive with regard to the admittedly arguable proposition that § 102, making available to civil rights plaintiffs new claims for punitive and compensatory damages, as well as a right to jury trial, affects the substantive rights of the parties so as to make its retroactive application manifestly unjust, and therefore, impermissible under *Bradley.* Moreover, such a finding is consistent with the holding of the Court in *Vogel* that the presumption of retroactivity "should not be applied in contexts where 'substantive rights and liabilities', *broadly construed,* would be affected." 959 F.2d at 598 (emphasis added). Nonetheless, this court realizes that such a stance with regard to the damages and jury trial provisions is not without substantial challenge. *See, e.g.,* cases cited *supra,* p. 1176 n. 17.

Nevertheless, having decided that § 101(2)(b) of the 1991 Act, which provides a civil rights plaintiff with a new and distinct cause of action under § 1981, is substantive in nature, it is unnecessary for this court to determine conclusively whether the damages and jury trial provisions are likewise substantive in nature. Rather, this court simply notes that "[w]hen new statutes contain both substantive and procedural changes to the existing law, the Eleventh Circuit has refused to apply any

---

**21.** The court here cites *Van Meter* as analogous support only, since Plaintiff in the instant case does not seek compensatory damages "against the United States."

part of the new statute retroactively." *Maddox*, 783 F.Supp. at 584 (citing *Fernandez–Toledo*, 749 F.2d at 705 n. 6).

*Fernandez–Toledo* involved the proposed retroactive application of the Comprehensive Crime Control Act of 1984, § 101 *et seq.*, Pub.L. No. 98–473, 98 Stat. 1837, 18 U.S.C. § 3731 (amending previously enacted "Bail Act"). After discussing the *Bradley* presumption of retroactivity, as well as the Eleventh Circuit's substance/procedure distinction, the Court found that in that case, "the changes in the substantive and procedural aspects of the Bail Act are contemporaneous." *Id.* at 705. As a result, the Court in *Fernandez–Toledo* refused "to give the Act partial retroactivity," holding that the Bail Act would not apply retroactively to that case. *Id.*

More recently, in *Maddox*, cited *supra*, the Court applied the rule against partial retroactivity enumerated in *Fernandez–Toledo* in the context of the 1991 Act. In *Maddox*, as here, the plaintiff sought retroactive application of the 1991 Act so as to allow her to assert a claim under § 1981. Restating the *Fernandez–Toledo* rule, the Court in *Maddox* stated: "The Eleventh Circuit has held that purely remedial statutory changes apply retroactively, while changes that affect *both substantive and procedural rights* do not." 783 F.Supp. at 586 (citing *Fernandez–Toledo*, 749 F.2d at 705) (footnote omitted) (emphasis in original). The Court concluded that "[u]nder *Fernandez–Toledo*, the presence of any substantive changes precludes retroactive application of the Act in whole or in part." *Id.* After finding, as has this court, that § 101(2)(b) of the 1991 Act is indeed substantive in nature, the Court in *Maddox* concluded that under the rule enumerated in *Fernandez–Toledo*, retroactive application of the 1991 Act was impermissible. In fact, the Court in *Maddox* concluded, as did this court in its December 3, 1991 Order in the instant case, that the 1991 Act "does not apply to cases pending as of November 21, 1991, the date of the Act's enactment." *Id.*

The *Fernandez–Toledo* rule was again applied in the context of the 1991 Act in *Doe*, cited *supra*. There, as in *Maddox*, the Court found that "[l]ike the statutory change in *Fernandez–Toledo*, the 1991 Act affects both substantive rights, and procedural or remedial matters." 783 F.Supp. at 1385. First, the Court in *Doe* found that as regards § 101(2)(b) of the 1991 Act, "the new cause of action under § 1981, affects the parties' antecedent rights." *Id.* Next, the Court in *Doe*, unlike the Courts in *Mozee, Sessions, Johnson,* and *Van Meter, see supra*, found the amendments related to damages, jury trial, and attorneys' fees to be "arguably procedural or remedial." Nevertheless, the Court in *Doe* concluded that given the mixture of substantive and procedural, or remedial, provisions contained within the 1991 Act, application in that case would constitute "partial retroactivity." This the Court refused to allow, declining to take such a "piece-meal approach" to statutory construction. *Id.*[22]

■■■ This court agrees with the Courts in *Maddox* and *Doe* that the 1991 Act contains a mixture of substantive and procedural, or remedial, provisions. As a result, under the rule enumerated in *Fernandez–Toledo*, no provisions of the 1991 Act, whether themselves substantive or procedural in nature, may be given retroactive application. As did the Courts in *Maddox* and *Doe*, this court declines to take the "piece-meal approach" to statutory construction which the retroactive application of the 1991 Act in the instant case would require.

### c. Conclusions

■■■■ To summarize this court's analysis, this court, in keeping with prior cases from this district, finds that in the instant case, both the statutory language and the legislative history of the 1991 Act are unclear on the issue of retroactivity. As a

---

**22.** For a general discussion of the undesirability of partial retroactivity, *see Mozee*, 963 F.2d at 940 ("In short, it may cause undue confusion to require a trial court to conduct a provision-by-provision analysis of an act in order to distinguish between those provisions regulating procedure and damages and those provisions that affect substantive rights and obligations.").

result, this court agrees with earlier decisions from this district in finding that under the *Bowen* presumption of nonretroactivity, retroactive application of the 1991 Act in the instant case is impermissible. However, this court departs from earlier decisions from the district in finding, based upon its own independent analysis, that under the three-factor manifest injustice test enumerated in *Bradley*, as well as the simplified version of that test employed in this circuit, manifest injustice would result from retroactive application of the 1991 Act in the instant case, thus making such retroactive application equally impermissible under *Bradley*.

This court as a result concludes that *even if* the court were to analyze this case under the *Bradley* rule, which it finds not only to be at present of questionable precedential value, but also to represent the less desirable rule of statutory construction, its conclusion would be the same. In the instant case, the court finds that under either *Bradley* or *Bowen*, the 1991 Act may not be applied retroactively so as to allow Plaintiff's requested relief.

### D. Why Bowen and Wright Represent the Better Rule of Statutory Construction

As stated before, it is this court's position that *Peppertree*, having been vacated and remanded, may no longer be binding precedent within this circuit on the issue of retroactive application of statutes. Thus, by implication, this court finds that *Bradley* may no longer represent the presumptive test applicable in the Eleventh Circuit. As a result, and as stated before, it is this court's opinion that *Bowen*, through *Wright*, currently stands as the only remaining unquestioned precedent binding upon courts in this circuit with regard to retroactivity.

■■■ Moreover, aside from *Peppertree*'s current questionable precedential status, this court quite simply finds the rule enumerated in *Bowen*, and reiterated as the law of this circuit in *Wright*, to be the better rule, and the rule which is more in keeping with traditional notions of statutory construction, not to mention of fundamental fairness. The court assumes this position for several reasons.

### 1. Bowen Represents the More Established Rule of Statutory Construction

First, this court finds *Bowen* to be the better rule on the grounds that *Bowen* and the cases upon which *Bowen* is based represent the older and more established rule of statutory construction. This fact is clearly chronicled in the Eighth Circuit Court of Appeals' recent decision in *Fray*, cited *supra*. There, the Court stated:

It was a principle of ancient Roman civil law that legislation must be prospectively applied unless the legislature specifically decreed a retroactive application. This principle was incorporated into the English common law and carried forward through the centuries by venerable common law chroniclers such as Bracton, Coke, Blackstone, and Sir Francis Bacon. *See generally* Elmer E. Smead, *The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence*, 20 Minn. L.Rev. 775, 775–781 (1936).

960 F.2d at 1374.

Prior to the Supreme Court's 1969 decision in *Thorpe*, cited *supra*, this was a long and well established principle of American jurisprudence as well.

"[T]he first rule of construction is that legislation must be addressed to the future, not to the past ... [and] a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature."

*Greene*, cited *supra*, 376 U.S. at 160, 84 S.Ct. at 621–622 (quoting *Union Pac. R.R. Co. v. Laramie Stockyards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913)). Indeed, the Court in *Greene* was merely reiterating a basic tenet of statutory construction which had been recognized and adhered to by American courts for years. *See, e.g., Claridge Apartments*, cited *supra*, 323 U.S. at 164, 65 S.Ct. at 185

("Retroactivity, even where permissible, is not favored, except upon the clearest mandate."); *Miller,* cited *supra,* 294 U.S. at 439, 55 S.Ct. at 442 ("The law is well settled that generally a statute cannot be construed to operate retrospectively unless the legislative intention to that effect unequivocally appears.") (citations omitted); *Magnolia,* cited *supra,* 276 U.S. at 162–163, 48 S.Ct. at 237 ("Statutes are not to be given retroactive effect or construed to change the status of claims fixed in accordance with earlier provisions unless the legislative purpose so to do plainly appears.") (citations omitted); *Laramie Stockyards,* cited *supra,* 231 U.S. at 199, 34 S.Ct. at 102 ("The first rule of construction is that legislation must be considered as addressed to the future, not to the past.... Retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be the 'unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'") (quoting *U.S. v. Heth,* 7 U.S. (3 Cranch) 399, 413, 2 L.Ed. 479, 484 (1806) ("Words in a statute ought not to have a retrospective operation, unless they are so clear, strong, and imperative, that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied.")) (additional citations omitted); *United States Fidelity & Guar. Co. v. United States for the Use and Benefit of Struthers Wells Co.,* 209 U.S. 306, 314, 28 S.Ct. 537, 539, 52 L.Ed. 804 (1908) ("The presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other."). The Court in *Fray* continued:

> Indeed, prior to 1969, American constitutional law was more hostile to the retroactive application of statutes than English common law—many Supreme Court cases held that even legislatively mandated retroactivity may violate the Contract,

Due Process, or Ex Post Facto clauses of the Constitution.

*Fray,* 960 F.2d at 1374 (citing Smead, 20 Minn.L.Rev. at 790–797).

As the Court in *Fray* recognized,

> [t]he Supreme Court destabilized this rather settled doctrine in *Thorpe.* ... Without acknowledging the centuries of decisions seemingly to the contrary, the Court held in *Thorpe* and *Bradley* that a new statute must be retroactively applied to a case that was pending on appeal at enactment "unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."

*Id.* (quoting *Bradley,* 416 U.S. at 711, 94 S.Ct. at 2016). The Seventh Circuit in *Mozee* apparently shares this belief. According to that Court,

> [t]he Supreme Court, until its 196[9] decision in *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268 [89 S.Ct. 518, 21 L.Ed.2d 474] (196[9] ), followed the general presumption that statutes were to apply prospectively unless the statute expressly provided otherwise. However, in *Thorpe* the Supreme Court stated that the presumption runs the other way. *Thorpe,* 393 U.S. at 281 [89 S.Ct. at 525]. The *Thorpe* decision reached this conclusion without discussing its deviation from a long line of precedent.

*Mozee,* 963 F.2d at 934 (citing *Bonjorno,* 494 U.S. at 842, 845, 110 S.Ct. at 1579–80, 1581 (Scalia, J., concurring)).

This court agrees with the Eighth Circuit, however, that "[a]lthough many lower courts have interpreted *Bradley* as establishing a new retroactivity standard, the Supreme Court has now made it clear that *Bradley* did not silently sweep away the traditional principle." *Fray,* cited *supra,* 960 F.2d at 1374.[23] *See, e.g., Bennett v. N.J.,* 470 U.S. 632, 639, 105 S.Ct. 1555, 1560, 84 L.Ed.2d 572 (1985) (referring to

---

**23.** It is noteworthy that subsequent to deciding *Fray,* the Eighth Circuit Court of Appeals has affirmed its position that the 1991 Act should not be applied retroactively. *See Huey v. Sullivan,* 971 F.2d 1362, 1365–66 (8th Cir.1992) (cit-

ing *Fray* ); *Williams v. Valentec Kisco, Inc.,* 964 F.2d 723, 731 (8th Cir.1992) (same); *Valdez v. Mercy Hosp.,* 961 F.2d 1401, 1404 (8th Cir.1992) (same).

the "venerable rule of statutory interpretation" that "statutes affecting substantive rights and liabilities are presumed to have only prospective effect.") (no retroactive effect given to amendments to Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 241a *et seq.* (1976 ed.), where no evidence of legislative intent); *United States v. Security Ind. Bank,* 459 U.S. 70, 79–80, 103 S.Ct. 407, 412–413, 74 L.Ed.2d 235 (1982) ("The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student.") (no retroactive effect given a bankruptcy statute where no legislative intent found). Finally, in 1988, the Supreme Court in *Bowen* restated the traditional principle of presumed prospective application without even citing *Bradley* or *Thorpe.*

More recently, in *Bonjorno,* cited *supra, Bradley* and *Thorpe* came under direct attack. In his concurring opinion, Justice Scalia takes issue with *Bradley* and *Thorpe* on several very compelling grounds. First, Justice Scalia argues that both *Thorpe* and *Bradley* were based upon a misinterpretation of the Court's opinion in *Schooner Peggy,* cited *supra.* 494 U.S. at 846–50, 110 S.Ct. at 1576–84. Here, Justice Scalia states:

It is clear that what *Schooner Peggy* meant by a law that 'positively changes the rule which governs' was one which, like the law there at issue, explicitly recites its application to preenactment events.... *Thorpe* derived from *Schooner Peggy* the 'general rule ... that an appellate court must apply the law in effect at the time it renders its decision.' 393 U.S., at 281 [89 S.Ct. at 526]. Of course it does not stand for that at all—or at lease not in the sense that *Thorpe* implied. It stands for the proposition that when Congress *plainly says—contrary* to the ordinary presumption which courts will 'struggle hard' to apply—that current law rather than the pre-existing law governs the rights of parties, then the courts 'must apply' that current law.... If retroactive effect is explicit, retroactive effect is accorded.

*Id.* at 846–47, 110 S.Ct. at 1576–82 (emphasis in original). Justice Scalia furthermore notes that of all the earlier cases cited in *Thorpe* and *Bradley, "not a single one ...* even *purports* to be applying a presumption of retroactivity." *Id.* at 850, 110 S.Ct. at 1584 (emphasis in original). Rather, notes Justice Scalia, all of those cases either: (1) involved the application of a judicial decision—"which is of course traditionally regarded as an expression of pre-existing law"; (2) involved the retroactive application of a statute which, like the statute in *Schooner Peggy,* "explicitly demanded retroactive effect"; (3) involved the repeal of a criminal statute—"which has always been an exception to the general rule that statutes are prospective"; (4) involved the application of an agency rule to a pending permit application; or (5) purported "not to be acting retroactively at all." *Id.* at 847–50, 110 S.Ct. at 1582–84 (citations omitted).

Second, Justice Scalia argues that the rule set forth in *Thorpe,* and reiterated in *Bradley,* runs contrary to traditional and long-standing principles of presumptive nonretroactivity. *Id.* at 841–44, 110 S.Ct. at 1579–81. Here, Justice Scalia notes that "[d]uring all of the 19th and most of the 20th centuries, our cases expressed and applied, to my knowledge without exception, the principle that legislation is to be applied only prospectively unless Congress specifies otherwise." *Id.* at 842, 110 S.Ct. at 1579 (citations omitted). He further states that this long-standing principle of presumptive nonretroactivity "has timeless and universal human appeal", while the rule of presumptive retroactivity "is contrary to fundamental notions of justice, and thus is contrary to realistic assessment of probable legislative intent." *Id.* at 855, 110 S.Ct. at 1582.

Finally, Justice Scalia argues that in enumerating the three-part "manifest injustice" test, the Court in *Thorpe* and *Bradley* essentially "invented an all-purpose exception to their counterintuitive rule" of presumptive retroactivity. *Id.* at 856, 110 S.Ct. at 1587. Noting that " 'manifest injustice' might mean ... almost anything", *id.,* Justice Scalia continues:

"Manifest injustice," I fear, is just a surrogate for policy preferences. Indeed, it cannot be otherwise. Once one begins from the premise of *Thorpe* and *Bradley* that, contrary to the wisdom of the ages, it is not in and of itself unjust to judge action on the basis of a legal rule that was not even in effect when the action was taken, then one is not really talking about "justice" at all, but about mercy, or compassion, or social utility, or whatever other policy motivation might make one favor a particular result. A rule of law, designed to give statutes the effect Congress intended, has thus been transformed to a rule of discretion, giving judges power to expand or contract the effect of legislative action. We should turn this frog back to a prince as soon as possible.

*Id.* at 857, 110 S.Ct. at 1587.

Justice Scalia concludes that he

would have taken the occasion [in *Kaiser*] to admit that the rule we [the Supreme Court] expressed in *Thorpe* and *Bradley* was wrong, and to reaffirm the clear rule of construction that has been applied, except for these last two decades of confusion, since the beginning of the Republic and indeed since the early days of the common law: absent specific indication to the contrary, the operation of nonpenal legislation is prospective only.

*Id.* at 841, 110 S.Ct. at 1579 (footnote omitted). Nevertheless, "[d]espite acknowledging the 'apparent tension' between *Bradley* and the traditional principle of non-retroactivity, the Supreme Court majority in *Bonjorno* declined Justice Scalia's invitation to reconcile these two lines of precedent."

Although many lower courts appear to have construed *Bowen* as a divergence from the previously stated rule of *Bradley* and *Thorpe*, this court agrees with Justice Scalia in *Bonjorno*, as well as the Eighth Circuit in *Fray*, that in fact, it was *Bradley* and *Thorpe* which represented an unprecedented departure from the traditional rules of statutory construction which were simply restated in *Bowen*. As Justice Scalia noted in *Bonjorno*, acceptance of the *Bradley* presumption "is a question of adopting in all cases, and contrary to an immense volume of precedent, the presumption that statutes have retroactive effect. That unthinkable course was rejected, as recently as last Term, in [*Bowen*]." *Id.* at 855, 110 S.Ct. at 1586.

### 2. Bradley, Thorpe and Schooner Peggy are All Factually Distinguishable from the Instant Case

Second, this court deems *Bowen* to be the better rule in the instant case, since not only *Bradley* itself, but also *Thorpe* and *Schooner Peggy*, upon which *Bradley* was primarily based, are on numerous grounds factually distinguishable from the situation at hand. *Schooner Peggy*, the older of the cases relied upon in *Bradley*, was decided by the Supreme Court in 1801. In *Schooner Peggy*, the Court was faced with the question of whether to apply a particular article of a treaty entered into between the United States and France to permit restoration of a captured French ship against which United States condemnation proceedings were pending before the Court. At issue in the case was the fourth article of the convention, which provided:

> Property captured, and not yet definitively condemned, or which may be captured before the exchange of ratifications, ... shall be mutually restored.... This article shall take effect from the date of the signature of the present convention. And if, from the date of the said signature, any property shall be condemned contrary to the intent of the said convention, before the knowledge of this stipulation shall be obtained, the property so condemned shall without delay be restored or paid for.

*Schooner Peggy*, 5 U.S. (1 Cranch) at 107, 2 L.Ed. at 50 (citing 8 Stats. at Large, 178) (emphasis added). Reasoning that a ship is not "definitively condemned" until the conclusion of the final appeal of that condemnation, the Court in *Schooner Peggy* found that the vessel in question, regarding which the appeal of condemnation was still pending, fell within the article's language, and therefore was to be restored. In contrast to the instant case, however, the hold-

ing in *Schooner Peggy* was specifically based upon the fact that the article in question *expressly provided* for retroactive application to pending cases.

Nevertheless, the Supreme Court in its 1969 decision in *Thorpe*, quite inexplicably and drastically expanded the rule enumerated in *Schooner Peggy*. In *Thorpe*, the Court was faced with a situation in which the relevant Housing Authority had evicted the petitioner from her home in a federally assisted low-rent housing project. At the time of her eviction, the regulations of the Department of Housing and Urban Development ("HUD") allowed a Housing Authority to evict a tenant by merely giving the tenant written notice, and did not require that the Housing Authority provide reasons for its decision to evict the tenant. In keeping with these HUD regulations, the respondent Housing Authority had provided the petitioner with written notice of its intent to evict the petitioner, but refused to provide any reasons for its decision. The petitioner subsequently appealed her eviction, claiming that she was evicted solely because she had, just three days prior to the receipt of her notice of eviction, been elected president of the relevant tenants' organization. While her case was pending, however, HUD issued a circular requiring a Housing Authority, upon providing a tenant with written notice of its decision to evict the tenant, also to provide specific reasons for the eviction.

Thus, the central question before the Supreme Court in *Thorpe* was whether to retroactively apply the new HUD circular to petitioner's case. Initially, the Supreme Court vacated and remanded the case for further proceedings deemed appropriate in light of HUD's new circular. On remand, however, the North Carolina Supreme Court refused to apply the new HUD circular to the petitioner's case and reaffirmed its prior decision upholding the petitioner's eviction. On appeal, the Supreme Court again considered the case, and decided that in that situation, retroactive application of the new HUD circular to the petitioner's pending case was appropriate.

In so holding, the Court relied primarily upon *Schooner Peggy*. According to the Court in *Thorpe*, "[t]he general rule ... is that an appellate court must apply the law in effect at the time it renders its decision." 393 U.S. at 281, 89 S.Ct. at 526 (citing *Ziffrin, Inc. v. United States*, 318 U.S. 73, 78, 63 S.Ct. 465, 469, 87 L.Ed. 621 (1943) ("A change in the law between a nisi prius and an appellate decision requires the appellate court to apply the changed law.").[24] After providing this broad overstatement of the general rule, the Court provided the following quote from Chief Justice Marshall's opinion in *Schooner Peggy*:

> "[I]f subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional, ... I know of no court which can contest its obligation. It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns ... the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which can-

---

**24.** As an aside, *Ziffrin* is equally factually distinguishable from the instant case. That case, rather than involving the retroactive application of a statute, involved the application of a newly promulgated rule of the Interstate Commerce Commission ("ICC") to deny a permit application which had been filed with, but not acted upon by, the ICC at the time of the Commission's promulgation of the new rule. In fact, *Ziffrin* only arguably involved any issue of "retroactivity," as that term is being applied to the instant case, at all. Rather, it would seem to this court that as opposed to laws which pre-

sumably will only be applied in the future, one would assume and fully expect that an agency considering a permit application *for future use* would indeed apply its own rules as they exist at the time of such consideration. Moreover, the Court in *Ziffrin*, in allowing "retroactive" application of the ICC rule in that case, relied in large part upon the fact that the new ICC rule, unlike the 1991 Act at issue in the instant case, in fact was not new, but rather merely clarified the interpretation of relevant criteria previously applied by the ICC to such permit applications.

not be affirmed but in violation of law, the judgment must be set aside."

*Thorpe,* 393 U.S. at 282, 89 S.Ct. at 526 (quoting *Schooner Peggy,* 5 U.S. (1 Cranch) at 110, 2 L.Ed. at 51). Thus, the Court in *Thorpe* concluded that in that case, it should apply the law in effect at the time of its decision. Accordingly, the Court applied the new HUD circular to the petitioner's pending case, and required the Housing Authority to provide not only written notice of eviction, but also its reasons for eviction, thus invalidating the respondent Housing Authority's prior eviction of the petitioner.

As was the case with *Schooner Peggy,* however, *Thorpe* is factually distinguishable from the instant case. In *Thorpe,* the petitioner in fact was allowed to stay in her apartment pending her appeal of the eviction. Thus, the decision by the Court to retroactively apply the HUD circular in question merely required the respondent to provide the petitioner with reasons for, in addition to written notice of, the eviction. As the Court recognized in *Mozee,*

[t]he procedural right at stake in *Thorpe* was very different from a procedural right at stake in most trials.... In *Thorpe* the Supreme Court merely forced a government agency to follow procedures after the Court recognized that some procedure was necessary to avoid constitutional due process problems. [*Thorpe,* 393 U.S.] at 283 [89 S.Ct. at 526]. Another very important distinction between retroactive application of the procedures in *Thorpe* and the retroactive application of procedural provisions in the 1991 Civil Rights Act on appeal is that in *Thorpe* there was no process given to the parties in the first instance. Therefore, in *Thorpe* the retroactive application of the rules did not require the agency to go through the expense of conducting two proceedings. That is, *Thorpe* did not involve a situation where the agency had to spend money redoing a procedure that had already been rendered. On the other hand, in cases like that before this court, where the parties have already litigated the issues on appeal, the retroactive application of a procedural provision could require a new trial and could, therefore, require double expenses. It appears that in most appeals such a retrial would rise to the level of manifest injustice, thereby rendering the *Thorpe–Bradley* rule inapplicable.

*Mozee,* 963 F.2d at 937 (citing *Bradley,* 416 U.S. at 716, 94 S.Ct. at 2018).

Moreover, this court respectfully agrees with Justice Scalia in his concurrence in *Bonjorno,* in which he argues that *Thorpe* was based upon a misinterpretation of *Schooner Peggy.* *See Bonjorno,* 494 U.S. at 827, 110 S.Ct. at 1570 (Scalia, J., concurring). *See also,* discussion, *supra* pp. 1188–89. The decision in *Schooner Peggy* was specifically based upon that Court's finding that the article in question expressly provided for the retroactive application requested. No such express provision existed in either *Thorpe* or *Bradley,* or indeed exists in the instant case.

In addition, this court agrees with Justice Scalia that the Court in *Thorpe* gave to Chief Justice Marshall's statements in *Schooner Peggy* a meaning which they were never intended to have. In discussing the situation in which "subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs," *Thorpe,* 393 U.S. at 282, 89 S.Ct. at 526 (quoting *Schooner Peggy,* 5 U.S. (1 Cranch) at 110, 2 L.Ed. at 51), Chief Justice Marshall was not, as the Court in *Thorpe* apparently believed, stating that *any time* a new law is enacted during the pendency of a case, it necessarily "positively changes the rule which governs" that case. Rather, he was merely stating the commonsense proposition that *when* the "law intervenes and positively changes the law which governs," i.e., when the new law *expressly provides* for retroactive application, as was the case in *Schooner Peggy,* the court cannot ignore that new law in disposing of the case. In *Thorpe* and *Bradley,* as in the instant case, no such express provision exists, which would "positively change[ ]" the law to be applied.

Finally, the *Bradley* Court in 1974 applied the *Schooner Peggy* rule, as arguably misconstrued in *Thorpe*, to retroactively apply an attorney's fees provision to a civil rights case which had been pending in the court for some thirteen years. Again, this court reiterates its belief that *Bradley* merely served to further expand *Thorpe*'s already broad overstatement of the rule enumerated in *Schooner Peggy*. Indeed, according to Justice Scalia, "[t]he confusion that *Thorpe* introduced into this otherwise settled area of law was reinforced and perhaps expanded" in *Bradley*. *Bonjorno*, 494 U.S. at 848, 110 S.Ct. at 1582 (Scalia, J., concurring)

Even if one does not share this court's belief, and that of Justice Scalia, that both *Thorpe* and *Bradley* represent impermissible overstatements of the rule enumerated in *Schooner Peggy*, *Bradley*, like *Thorpe* and *Schooner Peggy*, is factually distinguishable from the instant case. This court again agrees with the Seventh Circuit Court of Appeals in *Mozee*:

> *Bradley*, like *Thorpe*, has limited application to cases on appeal.... In *Bradley* the court was merely confirming a prior district court order that allowed attorney fees under the private attorney general theory. [*Bradley*, 416 U.S.] at 708 [94 S.Ct. at 2014]. Accordingly, the attorney fee provision that was applied to the parties in *Bradley* arguably constituted a mere codification of the law as it existed before its enactment. Moreover, considering that the district judge had already calculated the amount of allowable attorney fees up to a certain date, the application of this statute did not require the parties to relitigate the issue of what constituted reasonable attorney fees. This meant that the danger of requiring parties to redo damage proceedings once the hearings were completed and the case reached appeal was not at issue in *Bradley*. Moreover, considering that attorney fee provisions are not as closely intertwined with the issue of liability as are other types of damage provisions, the application of this provision on appeal did not run the risk of requiring the trial court to reassess lia-

bility determinations. *Bradley* was a unique case where the application of an attorney fee provision on appeal did not require the parties to redo prior proceedings. *Bradley*'s precedent on appeal will, therefore, apply only to cases with a factual backdrop similar to that in *Bradley*. This means that on appeal *Bradley*, at the most, applies when evaluating damage provisions that do not affect substantive rights, and arguably applies only to attorney fee provisions.

963 F.2d at 937–38.

This court agrees. In fact, the court in *Bradley* made a point of stating that its award of attorney's fees pursuant to § 718 merely granted to the plaintiffs the attorney's fees which the court all along, prior to the enactment of § 718, possessed the discretionary authority to grant. Thus, one of the grounds upon which the Court in *Bradley* based its conclusion was the fact that the application of § 718 in that case did not impose any obligation upon the defendant which the Court did not already possess the discretionary authority to impose.

> From the outset, upon the filing of the original complaint in 1961, the Board engaged in a conscious course of conduct with the knowledge that, under different theories, ... the Board could have been required to pay attorneys' fees. Even assuming a degree of uncertainty in the law at that time regarding the Board's constitutional obligations, there is no indication that the obligation under § 718, if known, rather than simply the common-law availability of an award, would have caused the Board to order its conduct so as to render this litigation unnecessary and thereby preclude the incurring of such costs.

416 U.S. at 721, 94 S.Ct. at 2021. Thus, the Court in *Bradley* reasoned that the defendant had all along been aware that it might be held accountable for attorney's fees—if not pursuant to § 718, then pursuant to equity powers of the Court. Thus, the Court in *Bradley* concluded:

> The availability of § 718 to sustain the award of fees against the Board there-

fore merely serves to create an additional basis or source for the Board's potential obligation to pay attorney's fees. It does not impose an additional or unforeseeable obligation upon it.

416 U.S. at 721, 94 S.Ct. at 2021.

In the instant case, rather than merely imposing an obligation upon Defendant to which Defendant was already potentially obligated under alternate common law and/or equity theories, the 1991 Act imposes upon Defendant a number of entirely new obligations to which Defendant was not subject prior to the Act's passage, and at the time of the conduct in question. Thus, as the Court in *Mozee* stated, *Bradley* enjoys very limited, if indeed any, applicability in cases such as the instant one.

### 3. Application of Bowen Alone Satisfies Traditional Notions of Fundamental Fairness

Third, this court prefers the rule enumerated in *Bowen* and *Wright* on grounds of fundamental fairness. Indeed, it is a well established tenet of American jurisprudence that it is fundamentally unfair to hold an individual accountable under laws which, at the time the individual acted, were not laws to which he was bound. As expressed by the Court in *Mozee*, "one of the policies embodied in the need for prospective application is that it is unfair to hold private parties accountable for rules which were not in effect at the time in which the parties' relevant conduct took place." 963 F.2d at 936 (citing *Bonjorno*, 494 U.S. at 855, 110 S.Ct. at 1586 (Scalia, J., concurring)). The Court in *Mozee* concluded: "As such, the better and more fair rule is to hold the parties accountable for only those acts that were in violation of the law at the time the acts were performed." *Id.*

Moreover, according to Justice Scalia, the long-standing principle of presumptive non-retroactivity "has timeless and universal human appeal", while the rule of presumptive retroactivity "is contrary to fundamental notions of justice, and thus is contrary to realistic assessment of probable legislative intent." *Bonjorno*, 494 U.S. at 855, 110 S.Ct. at 1586 (Scalia, J., concurring).

*See also, Khandelwal v. Compuadd Corp.*, 780 F.Supp. 1077, 1081 (E.D.Va.1992) (Williams, J.) ("The presumption against retroactive application best preserves the distinction between courts and legislatures: the former usually act retrospectively, settling disputes between persons, the latter usually act prospectively, setting the general rules for future conduct.") (citing *Simmons v. Lockhart*, 931 F.2d 1226, 1230 (8th Cir.1991); *Wilson v. United States*, 917 F.2d 529, 537 (Fed.Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991)).

This court respectfully agrees with Justice Scalia in *Bonjorno*, as well as the Court in *Mozee*, that *Bowen* is more in keeping with this notion of fundamental fairness. In contrast, *Bradley* severely threatens such notions of fundamental fairness. It is here that the frequently discussed substance/procedure distinction hinted at in *Bradley* and employed by various subsequent courts loses its appeal. That is, the now familiar substance/procedure distinction seems to this court to be not only highly technical, but also insupportable on grounds of basic fairness. In making such a distinction, the court is allowed essentially to "pick and choose" the defendants to which new legislation is to apply.

An illustrative example is the situation in which two different defendants allegedly discriminate against two different plaintiffs on the same day, one day prior to enactment of the 1991 Act at issue in this lawsuit, with which neither defendant is familiar at the time of the alleged discrimination. The court in such a situation would be permitted to refuse to subject the first defendant to certain provisions of the new Act, with which the defendant at the time of his actions was unfamiliar, based upon the court's determination that "manifest injustice" would result therefrom. At the same time, however, the same court would be permitted to subject the second defendant to other provisions of the new Act, with which he was equally unfamiliar at the time of his actions, based upon the court's finding that "manifest injustice"

would not result in that case. Obviously, the resulting potential for unequal application of the Act calls into serious question the validity of such a discretionary approach.

As Justice Scalia noted in his concurrence in *Bonjorno*, the difficulty of the *Bradley* approach is further exacerbated by the completely discretionary nature of the "manifest injustice" test necessarily employed. *See* discussion, *supra* pp. 1188–89 (*Bradley*'s manifest injustice test is "just a surrogate for policy preferences", since " 'manifest injustice' might mean ... almost anything.") (quoting *Bonjorno*, 494 U.S. at 856–57, 110 S.Ct. at 1587 (Scalia, J., concurring)). Although the Court in *Bradley* set out to enumerate three specific factors to be considered in making the manifest injustice analysis, the Court necessarily relied upon essentially discretionary criteria in formulating the test. For example, at what point are the rights of a party determined to be "substantive", rather than "procedural", in nature? Is it not true that all rights are potentially "substantive" if they greatly impact the preparation for or outcome of a given litigation? When the requirements under the new Act would subject the defendant to a second trial on the merits, and therefore also would subject him to double fees and expenses and the need to alter his preparation for trial, does this not at some point become a "substantive" requirement?

This court agrees with Justice Scalia when he states:

> I suppose it would be possible to distinguish between statutes that alter 'substantive rights and liabilities' directly, and those that do so only by retroactively adding a procedural requirement, the failure to comply with which alters the 'substantive rights and liabilities'—but I fail to see the sense in such a distinction.

*Bonjorno*, 494 U.S. at 853, 110 S.Ct. at 1585 (Scalia, J., concurring).

Given the discretionary nature of the manifest injustice exception as stated in *Bradley*, it is this court's fear that proceed-

ing under *Bradley* would invite inequitable application of the 1991 Act, resulting in widely differing outcomes in individual cases. Indeed, this fear has to a certain extent been borne out by recent decisions from the many courts which have been called upon to construe the 1991 Act. As this court previously noted, these recent decisions differ substantially with regard to which precedent is followed, how that precedent is utilized, and the resulting outcome.[25] This court simply cannot condone and encourage such an unpredictable and inconsistent administration of the laws as would result—indeed, has already resulted—under *Bradley*.

### 4. Application of Bowen Alone Promotes Judicial Economy and Consistency

Fourth, this court deems *Bowen* the better rule on grounds of judicial economy and consistency. The briefest perusal of recent court decisions on this subject makes it obvious to the reader that a huge amount of judicial resources currently are being expended in an attempt to come to some consistent resolution of this issue. Presently, civil rights plaintiffs all over the country with cases pending—many on appeal after literally years of being in the courts—are requesting that they be allowed to amend complaints, even re-try cases, based upon the 1991 Act. Anyone reading only a few recent judicial decisions on the matter can glimpse the confusion and extreme inconvenience currently being visited upon the courts. As a result of conflicting precedent, not to mention conflicting interpretations of the Act, the legislative history, and the particular precedent chosen, as well as the highly discretionary nature of *Bradley*'s manifest injustice test, outcomes from the various courts examining the matter differ substantially, and evidence no hope in the near future for any real continuity and consistency.[26]

Vividly describing the current situation as a "tragi-comedy of confusion," the

---

**25.** *See, e.g.,* cases cited *supra,* p. 1162 n. 6.

**26.** *See* cases cited, *supra,* p. 1162 n. 6.

Court in *King v. Shelby Medical Center,* 779 F.Supp. 157, 158 (N.D.Ala.1991) (Acker, J.), highlights the potential for inconsistent positions, often to be assumed by a single individual in two different situations:

> The situation is an amazing one, to say the least. In *Peppertree,* the United States successfully convinced the Eleventh Circuit that a statute which allows the Government to recover double damages was merely "remedial in nature" and therefore should be applied retroactively to a transaction which occurred prior to the effective date of a law that could not possibly have been within the contemplation of that defendant at the time of the transaction complained of.... Fresh from its victory in *Peppertree,* the same United States which there fought for and obtained retroactive application of a statute doubling the damages to be paid by a violator, filed a brief in *Van Meter v. Barr* [778 F.Supp. 83], in the United States District Court for the District of Columbia, stating at considerable length the Department of Justice's position, entirely inconsistent with the exemplary victory it won in *Peppertree,* that no provision of the Civil Rights Act of 1991 applies to any case pending prior to November 21, 1991. The double damages recovered in *Peppertree* is the Siamese twin of the capped punitive damages allowed by the new Act. Why should one be retroactive and the other not be?

*Id.,* 779 F.Supp. at 157–58. As the Court in *King* correctly notes with regard to the confusion currently being visited upon the courts, "[t]he ultimate answer on the retroactivity or non-retroactivity of the Civil Rights Act of 1991 will be long in coming, and only after thousands of judicial hours, which Congress could easily have saved, are spent." *Id.* 779 F.Supp. at 158.

> As Justice Scalia stated in *Bonjorno:* The *Thorpe–Bradley* presumption of retroactivity, which is arguably formulated to apply to a relatively narrow class of cases but which logically must be extended across the board, misleads prospective litigants and confuses judges of the lower courts. I would say that it confuses even Congress itself—except that I believe and hope that legislators choose their language with the assumptions that just men and women normally entertain, rather than the assumptions derived from consulting the latest decision of this Court.

494 U.S. at 858, 110 S.Ct. at 1588 (Scalia, J., concurring).

Indeed, such confusion, inconsistency, and wasted resources as are presently being visited upon civil rights litigants are to be expected whenever courts are called upon to construe precedent which is both unclear and of a highly discretionary nature. As a result, such is the outcome to be expected when courts are called upon to make retroactivity determinations based upon *Bradley's* discretionary manifest injustice test. This court therefore finds that the bright-line rule enumerated in *Bowen* is the better rule from the standpoint of judicial economy and consistency. Under *Bowen,* the court is simply called upon to examine the statute's language and its legislative history. If neither is clear, the statute is given prospective effect only.[27] In contrast, *Bradley* at that point requires the court to engage in a highly discretionary analysis of the nature of the parties involved, as well as the nature of the rights at stake in order to determine whether retroactive application would result in "manifest injustice." As stated above, such an approach invites judicial confusion, inconsistency, and wasted resources. At a time when judicial and individual resources are of such critical scarcity as at present, this court cannot condone such a result.

### 5. Application of Bowen Alone Fosters Congressional Accountability

Fifth, this court favors *Bowen* as the better rule on the grounds that *Bowen*

---

27. Moreover, one must assume that if the courts were to adopt such a bright-line approach, and consistently follow that general rule, Congress would act accordingly, and would draft legislation with that in mind.

alone fosters congressional accountability, and prevents Congress from forcing the courts into the virtually impossible situation in which they currently find themselves. In effect, Congress in the instant case has been allowed to force the courts to legislate, which the courts are ill equipped to do. This fact is borne out by the numerous recent court decisions evidencing not only the courts' repeated frustration with this issue, but also their total lack of consistent outcomes and their recurring confusion regarding the proper approach to be taken. In a nutshell, Congress is vested with the power to draft legislation. The judiciary is vested with the power to interpret, construe and apply that legislation. In the instant case, Congress has been allowed to intentionally abdicate a central aspect of its legislative function to the courts, which should not be allowed and cannot be condoned.

Nevertheless, such abdication has occurred in the instant case, and the courts are left to deal with the ensuing confusion. It is this court's opinion that the time has come for the courts to send a message back to Congress: "If you do not put it in the statute, we will not presume it." In other words, the court should adopt the stance enumerated in *Bowen,* and thereby inform Congress that unless the statute plainly provides for retroactive application, or the legislature otherwise makes its intent clear, the courts will not presume retroactivity. Moreover, as stated before, one must assume that if the courts were to adopt such a bright-line approach; and consistently follow that general rule, Congress would act accordingly, and would draft legislation with that in mind.

In contrast, in adopting and utilizing the highly discretionary test enumerated in *Bradley,* many courts in essence are agreeing to shoulder the unfair legislative burden placed upon them by Congress. It appears to this court that, indeed, it is this fundamental notion of congressional accountability, this fundamental recognition of the fact that Congress drafts legislation, while the courts interpret, construe and apply that legislation, that underlies the traditional and long-standing rule of presumed nonretroactivity underlying *Bowen.*

Moreover, aside from the difficulties potentially caused in the instant case, the judiciary's silent acceptance of the unfair burden which Congress has placed upon it indeed would set an undesirable precedent for the future. That is, one would expect, in such a case, that whenever Congress could not agree on any given issue in any given bill, or when Congress could not agree with the President on such issue, then Congress again would simply delete the troublesome provision or provisions from the drafted bill, allow the President to sign the bill, and send yet another hopelessly vague statute to the courts for not only interpretation, construction and application, but also what amounts to additional drafting. Thus, the courts' confusion and the waste of scarce judicial and individual resources would begin again.

This may seem to some to be rather an inflexible approach for the courts to take. However, one need only look at the current state of confusion into which the courts have been thrown to see that just such an approach is necessary, lest Congress, every time it and the President cannot reach agreement on a specific issue of legislation, merely leave that issue for the courts to decide, as they apparently did here. As is evidenced by the current state of judicial confusion in the instant case, such an eventuality in effect could completely stymie the courts, not to mention necessitating the wasting of countless judicial and individual resources.

### 6. Application of Bowen Alone Promotes and is in Keeping with the Purposes of the 1991 Act

Sixth, finally, and perhaps most importantly, this court favors the *Bowen* bright-line rule on the grounds that such an approach is more in keeping with the intent and purposes behind the 1991 Act, as well as other civil rights statutes. As stated in the 1991 Act itself, its purpose is "to strengthen and improve Federal Civil rights laws, [and] to provide for damages in cases of intentional employment discrimi-

nation...." 1991 Act, "Synopsis". Indeed, this court previously has recognized that one of the primary goals of civil rights legislation is to expedite judicial treatment of, and the award of damages in, discrimination cases, particularly those asserted under Title VII. *See Parker v. Dole,* cited *supra,* 668 F.Supp. at 1567 (recognizing that one of Congress' purposes in enacting Title VII was to expedite as much as possible judicial treatment of cases alleging discrimination, particularly in the area of "Title VII cases, where justice delayed is very often justice denied.") (quoting Title VII, 42 U.S.C. § 2000e *et seq.* (1988), Legislative History at 1730-31) (also citing 42 U.S.C. § 2000e-5(f)(5)).

Currently, the courts are faced with a situation in which they are being required: (1) to reexamine literally hundreds of cases, many of which have already been tried on the merits, (2) to possibly allow the plaintiffs leave to amend their complaints and/or to strike the court's previous judgment(s) on the merits, (3) which frequently will result in the need essentially to "start from scratch" and re-prepare, then re-try, the cases, (4) expending countless judicial—not to mention individual—resources in the process. Even if these courts do allow amendment and retrial of such cases, they nevertheless run a substantial risk of eventually being overturned by a higher court on the retroactivity issue.

In fact, regardless of how the Supreme Court eventually resolves the conflict—if indeed it does choose to resolve the conflict, which the Court to date has evidenced no inclination to do—that decision will overrule, one would presume, a very large number of lower court decisions necessarily following one precedent or another, or interpreting "manifest injustice" in one way or another. Currently, the lower courts are being asked blindly to decide, without the benefit of clear Supreme Court or Eleventh Circuit precedent, this very troublesome issue of retroactivity. Such blind decision making by the lower courts, and the resulting multiplication of appeals and delays in litigation, certainly may not be said to be in keeping with the goals of either Title VII or the 1991 Act.

Obviously, the legislative purposes of providing increased methods of recourse and damages to victims of discrimination, as well as of promoting the treatment of discrimination claims in as expeditiously a manner as possible, are not being fostered by a situation in which: (1) the courts are wasting countless judicial and individual resources in essence attempting to legislate where Congress has failed to do so; (2) the courts are uncertain which rule of construction to apply, therefore necessitating the inconsistent and often unfair distribution of damage awards; that is, whether correctly or not, the current judicial confusion has resulted in just as many civil rights plaintiffs being denied leave to amend their complaints or strike previous judgments, and thus being denied the right to seek the additional damages provided by the 1991 Act, as are being granted the right to seek additional damages; and (3) even if a plaintiff is allowed to seek additional damages, and indeed is eventually granted the award sought, that award potentially could be tied up in the judicial process for a number of years pending final resolution of the issue currently before the court; that is, if the Supreme Court eventually deems retroactive application to be impermissible, then those additional awards of course must be appealed and eventually stricken.

### IV. *Summary*

As a result of the above, and admittedly lengthy, analysis, this court draws several conclusions. First, the court concludes, for purposes of the instant Motion, that under either *Bowen* or *Bradley,* Plaintiff's Motion must be denied on the grounds that the 1991 Act may not be retroactively applied in the instant case. This conclusion is based upon the court's findings that: (1) both the language and the legislative history of the 1991 Act are unclear on the issue of retroactivity; (2) as a result, under *Bowen,* retroactive application is impermissible; and (3) alternatively, under *Bradley,* retroactive application in the instant case would result in "manifest injustice" so as to make such application likewise impermissible.

Second, the court concludes that given the recent decision by the Supreme Court vacating and remanding *Peppertree*, that case, and therefore *Bradley*, are of questionable precedential value within the Eleventh Circuit. Moreover, it appears to this court that, given the continued existence of *Wright*, and therefore *Bowen*, as circuit precedent on the issue of retroactivity, courts in this circuit currently are at least arguably required to follow, not *Bradley*, but *Bowen* on the issue of retroactivity.

Finally, the court concludes that *Bowen* simply represents the more desirable rule of statutory construction. *Bowen* represents the more established and long-standing rule of presumptive nonretroactivity. In addition, *Bradley*, *Thorpe* and *Schooner Peggy* are all factually distinguishable from the instant case on numerous grounds, and therefore enjoy limited application in the instant case. Moreover, this court agrees with previous courts which have indicated that *Thorpe*, and therefore *Bradley*, represent impermissible overstatements of the basic proposition enumerated in *Schooner Peggy*. In addition, application of *Bowen* alone satisfies traditional notions of fundamental fairness, promotes judicial economy and consistency, and fosters congressional accountability. Finally, application of *Bowen* alone promotes and is in keeping with the purposes of the 1991 Act.

The court concludes that indeed, this situation is, as one esteemed colleague put it, a "tragi-comedy of confusion." *King*, cited *supra*, 779 F.Supp. at 158. The lower courts currently are being asked to do that which they are perhaps most ill equipped to do—legislate. Moreover, they are being asked to do it in the complete absence of any real and consistent legislative or judicial guidance whatsoever. As a result, the lower courts are currently being forced to engage in just the sort of blind decision making that is abhorred by all proponents of judicial fairness, accountability, consistency, and economy. In effect, the lower courts are coming down on all sides of the issue, knowing that when—if—a definitive mandate arrives from a higher court, they, regardless of their best efforts, nevertheless stand a very substantial chance of being overturned.

It is therefore this court's conclusion that given the frustrating and confusing situation currently facing the courts, the bright-line rule enumerated in *Bowen* allows the courts the most opportunity for achieving some level of consistency and fairness. It is therefore this court's belief that *Bowen* represents the better rule, and indeed the rule which this court should follow.

## CONCLUSION

The court: (1) DENIES as moot Plaintiff's Motion to Set Aside Magistrate's Report and Recommendation [82–1]; (2) GRANTS Plaintiff's Motion for Leave to Alert Court to Recent Development Concerning the Retroactivity of the Civil Rights Act of 1991 [93–1]; (3) GRANTS Defendant's Motion to Alert Court to Recent Developments Concerning Non-retroactivity of the Civil Rights Act of 1991 [98–1]; and (4) DENIES Plaintiff's Motion to Alter or Amend Judgment and Order filed December 3, 1991 [86–1].

So ORDERED.